470 S.E.2d 613

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Jeffrey Scott LaROCK, Defendant Below, Appellant.**

No. 22979.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 27, 1996.

Decided March 20, 1996.

Dawn E. Warfield, Deputy Attorney General, Charles T. Berry, Law Student, Charleston, for Appellee.

Michael E. Froble, Wooton, Wooton & Fragile, Beckley, for Appellant.

CLECKLEY, Justice:

The defendant, Jeffrey Scott LaRock, appeals the June 16, 1994, order of the Circuit Court of Fayette County which denied his motion for judgment of acquittal or, in the alternative, for a new trial. The defendant was convicted by a jury of first degree murder and was sentenced to life imprisonment without mercy for the killing of his nineteen-month-old son, Joshua LaRock. The defendant does not deny that his actions caused his son's death; instead, at trial, the defendant primarily argued there was insufficient evidence to establish the requisite premeditation and intent for a conviction of first degree murder. On appeal, the defendant raises this issue along with numerous other assignments of error which we will address as warranted.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Ordinarily, we sketch the background, reserving more exegesis treatment of facts pending our discussion of specific issues. We give the facts of this case more detailed consideration because this appeal centers around the insufficiency of the trial evidence. The testimony at trial demonstrated the defendant subjected Joshua to a continued pattern of outrageous and atrocious acts of physical and mental abuse. The defendant allegedly hit Joshua in the stomach and face with his hands, he beat Joshua on the head and buttocks with a square stick that was two-feet, seven-inches long, and he would tie a rope or rag around the child's neck and would walk around with the child over his shoulder calling him names as a form of discipline.

1. Joshua died on February 21, 1993.

2. In his brief, the defendant states the record does not support the allegation that they left their relatives' house because the defendant hit Joshua too hard. However, Mrs. LaRock specifically said her sister-in-law "had seen [the defendant] hit my son too hard, and it led into an argument where she kicked him out of the home."

3. Renee was two and one-half years old at the time.

The defendant's wife, Stephanie LaRock, testified that the family moved to West Virginia from Kansas the summer before Joshua died.[1] While in Kansas, Mrs. LaRock stated the defendant hit Joshua and their daughter, Renee, so the welfare department placed them on a six-month trial period. When they moved to West Virginia, they lived with relatives for a few months, but Mrs. LaRock said they were forced to leave when the defendant and his sister got into an argument over the defendant hitting Joshua too hard.[2] The LaRocks then moved into the house where Joshua died.

To explain the possible cause of a skull fracture which Joshua suffered about ten to fourteen days prior to his death, Mrs. LaRock testified the defendant threw the child from the living room into the bathroom causing Joshua to hit his head on the bath tub. Mrs. LaRock stated that after the incident Joshua would "just lay around [and] . . . wouldn't do nothing." Mrs. LaRock said they did not take Joshua to the doctor because the defendant insisted there was nothing wrong with him.

On the night Joshua was killed, the defendant, his wife, Joshua, and Renee,[3] were at their house. Mrs. LaRock testified the defendant was attempting to get Joshua to eat and walk but he became furious apparently because Joshua would not cooperate. The defendant then began picking Joshua up "midway—to over his head" and dropping him from this height causing the child to hit his back and the back of his head against the floor. He dropped Joshua four or five times while calling him "a mother fucker[.]" Mrs. LaRock stated her husband stopped dropping Joshua when the child stopped crying.

The defendant testified the first thing he did after he stopped dropping Joshua was light up a cigarette,[4] but he "went over to do

4. At oral argument, defense counsel insisted there was no evidence at trial that the defendant lit up a cigarette after he stopped dropping Joshua. However, on page 515 of the trial transcript, the *defendant* testified on direct examination: "Well, first, I didn't realize the damage that I had caused, and what I done was walk over and light a cigarette, and that's the *first* thing I done." (Emphasis added). On cross-examination, page 535 of the trial transcript, the defen-

what [he] could for him" after he realized the child was not moving. Mrs. LaRock said they both began CPR. Mrs. LaRock further stated that when she got up to go to a neighbor's house to call an ambulance,[5] the defendant stopped her before she left the house and told her to move the high chair into the living room and say Joshua fell out of the chair.

Two neighbors came to help the LaRocks while they were waiting for the ambulance. When the first neighbor arrived on the scene, he stated Joshua was lying on a bed and the defendant was kneeling down beside him. The neighbor immediately began CPR, and the defendant assisted him. The neighbor recalls the defendant saying "come on, Josh, a couple of times" and telling his wife to pray. At some point, the neighbor remembers both the defendant and Mrs. LaRock standing beside the bed smoking cigarettes while he was giving Joshua CPR. The second neighbor testified that he helped keep "air out of the stomach" while the CPR was being performed and he drove the defendant to the hospital after the ambulance took Joshua.

The EMT who arrived on the scene with the ambulance stated that Joshua was in cardiac and respiratory arrest when she assessed him. At the hospital, the EMT asked what happened to Joshua, and the defendant told her "the baby was sitting in a high chair without a tray, and he [the defendant] was taking pictures to send to the grandparents. He said the baby was fidgeting around in the high chair, and he pitched forward, turned over in the air, and landed on his back." A paramedic who met the ambulance en route to the hospital testified that Mrs. LaRock told him a similar account of Joshua falling from the high chair.

Dr. John M. Johnson, the emergency room physician, examined Joshua and found he suffered a "massive skull fracture, which was recorded to be a three millimeter distraction and had several bruises to the torso and to the arms, which in [his] experience were inconsistent with a fall from a high chair."

After resuscitation efforts failed, Joshua was pronounced dead. Dr. Johnson's "final diagnosis was traumatic arrest secondary to a closed head injury."

Shortly after Joshua arrived at the hospital, Janet Turner, a Social Service Supervisor for the Department of Health and Human Resources, was contacted to investigate suspected child abuse. She contacted the West Virginia State Police, and she and Corporal Mike Spradlin of the State Police went together to the hospital. After Ms. Turner spoke with Dr. Johnson, she went to the chapel area of the hospital to discuss the situation with the defendant and Mrs. LaRock. Ms. Turner said neither parent showed any remorse or regret after being told of the death of their son, and she found their response to be very inappropriate. Ms. Turner testified the defendant gave her "a rather elaborate story as to what happened" and told her how Joshua fell out of his high chair. While they were talking, Corporal Spradlin came to the chapel and said he wanted to speak privately with Mrs. LaRock so Mrs. LaRock left with him.

Ms. Turner testified that she continued to talk with the defendant and he complained about Joshua not listening, eating, walking, and learning as the defendant thought he should. He stated Joshua would scream and throw temper tantrums and he did not want to be around them and "stay[ed] cooped up in his room." The defendant told Ms. Turner he hit Joshua "too hard sometimes," but said he did not hit him that night. He also admitted hitting the child in the face the previous night and, on other occasions, hitting the child in the stomach and other places on his body.

Corporal Spradlin testified that Mrs. LaRock told him Joshua fell out of the chair as he was being photographed. He also spoke with the defendant who related a similar account of the incident. Corporal Spradlin asked if he could secure the high chair and film from the house, and the defendant and Mrs. LaRock agreed. Thereafter, Corporal Spradlin, Ms. Turner, the defendant, and

---

dant further indicated the first thing he did was light up a cigarette.

**5.** The LaRocks did not have a phone in their house.

Mrs. LaRock[6] returned to the LaRock house. Corporal Spradlin took possession of the high chair and a roll of film. Neither the defendant nor Mrs. LaRock was taken into custody at that time. Corporal Spradlin stated he took the film to a local fast photo development shop and discovered there was nothing on the film.

The day following Joshua's death, the defendant contacted the State Police and said he wanted to discuss the situation. The defendant apparently was persuaded by relatives to confess. The defendant's brother-in-law took him to the barracks. The defendant told Corporal Spradlin that he lied at the hospital and he wanted "to set the record straight and take responsibility for the death of his son." The defendant signed a written confession, but the confession was ruled inadmissible at trial because, in part, the defendant repeatedly requested an attorney be present.

An autopsy was performed on Joshua by Dr. Irvin M. Sopher, the Chief Medical Examiner for the State of West Virginia. Dr. Sopher testified that Joshua had multiple bruises of varying ages. There were bruises on his face, his front torso, his back, and "extensive bruises" on his lower extremities. When Joshua's scalp was examined, Dr. Sopher also found "extensive additional bruises ... only one of which was appreciated from the outside examination." He testified that the severe bruises on the child's scalp "would be indicative of approximately four or five separate impacts[.]" In addition, Dr. Sopher discovered a skull fracture and a related hemorrhage which occurred about ten to fourteen days prior to the child's death, and he found an acute subdural hematoma which occurred about the time of death. He opined Joshua died of an "acute craniocerebral injury, meaning head injury with a skull fracture and brain injury." He further testified that, based upon his training and experience, the injury Joshua sustained to his scalp would be inconsistent with a fall from a high chair.

He said it was "a classic case of an abused child."

The defendant testified at trial and conceded he was a bad parent. He also did not deny hitting Joshua as a form of discipline and repeatedly picking up the child and dropping him on the day he died. When cross-examined about some of the specific incidents of abuse he was accused of committing, the defendant frequently replied that he either committed the act, possibly committed the act, or he did not remember. He also stated he would not dispute anything his wife said about him abusing Joshua. The defendant primarily asserted at trial that he did not intend to kill his son because he was in a state of "rage" at the time the incident occurred.

## II.

## DISCUSSION

Our analysis of the merits is divided into (a) sufficiency of evidence, (b) mental competency and ineffective assistance of counsel, (c) evidentiary error, (d) bifurcation of trial and sentencing, and (e) errors to which there were no objections.

■ Before we embark on an analysis of the relevant legal precedents and the facts, we need to make several points clear. In addition to the above assignments, the defendant raises some half-hearted assignments that were not fully developed and argued in the appellate brief. Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal. *State v. Lilly,* 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) ("casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal"). We deem these errors abandoned because these errors were not fully briefed.[7]

---

6. Corporal Spradlin said Ms. Turner made arrangements for the surviving child to be placed in temporary foster care or a temporary shelter.

7. Specifically, we find the defendant mentions four errors in his brief that were not fully de-

veloped and argued. First, the defendant complains the trial court erred by allowing the diagrams of Joshua's injuries into evidence—presumably because the defendant considers the diagrams "gruesome photographs." The diagrams consist of an outline of the front and

## A.

### *Sufficiency of the Evidence*

The defendant argues the trial court erred when it denied his motion for judgment of acquittal or, in the alternative, for a new trial because the State failed to sufficiently establish the elements of premeditation and deliberation for a first degree murder conviction. The defendant asserts he was in a "rage" and suffered from "diminished capacity" when he killed his son.

■ A convicted defendant who presses a claim of evidentiary insufficiency faces an uphill climb. The defendant fails if the evidence presented, taken in the light most agreeable to the prosecution, is adequate to permit a rational jury to find the essential elements of the offense of conviction beyond a reasonable doubt. Phrased another way, as long as the aggregate evidence justifies a judgment of conviction, other hypotheses more congenial to a finding of innocence need not be ruled out. We reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

■ In *State v. Guthrie,* 194 W.Va. 657, 667–70, 461 S.E.2d 163, 173–76 (1995), we recently revised our standard of review when a criminal defendant challenges the sufficiency of the evidence in support of a jury verdict. We adopted, both generally and in cases with circumstantial evidence, the standard set forth by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).[8] The Supreme Court held in *Jackson* that when reviewing a record in the light most favorable to the prosecution, an appellate court must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573. (Emphasis in original; citation omitted).

■ In adopting the *Jackson* standard, we retained a "highly deferential" and "strict" approach stating that "a jury verdict will not be overturned lightly"[9] and concluded in Syllabus Point 1 of *Guthrie:*

> "The function of an appellate court when reviewing the sufficiency of the evidence to

back of a male body and an outline of the front, back, right, and left side of a head. On the diagrams, there are marks indicating where Joshua had injuries. Not only do we find the defendant failed to indicate how these diagrams are "gruesome," but, upon review of the diagrams, we unequivocally conclude the diagrams are not gruesome and were admissible pursuant to Rules 401 through 403 of the West Virginia Rules of Evidence and this Court's recent decision in *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994).

Second, the defendant asserts in the same assignment of error where he complains about the photographs that the "trial court erred in allowing inflammatory and prejudicial evidence to be shown to the jury consisting of the high chair … which had no probative value." (Capitalization deleted). Other than this conclusory remark, the defendant makes no other argument with regard to the high chair, and we, therefore, deem this error waived.

Third, the defendant states in his brief "that his trial counsel was negligent in failing to consider the substantial evidence that could have been … provided by Dr. Hasan, a psychiatrist." Dr. Hasan did not testify at trial, and we are given no indication as to what evidence Dr. Hasan would have provided. If the defendant mentioned this issue to be considered only in conjunction with his ineffective assistance claim, then the defendant may raise the issue in a post-conviction collateral attack for ineffective assistance, *see* subsection B, *infra;* otherwise, we determine this error abandoned.

Fourth, the defendant alleges that one of the jurors failed to indicate he was acquainted with the defendant. We find no mention in the record of this acquaintance, and the defendant does not state in his brief how the two are acquainted. Moreover, the defendant does not claim this juror demonstrated any bias or prejudice towards him; thus, we conclude this error is waived.

8. Prior to *Guthrie,* the last time we addressed this issue was in *State v. Starkey,* 161 W.Va. 517, 244 S.E.2d 219 (1978). In Syllabus Point 1 of *Starkey,* we stated:

> "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

9. 194 W.Va. at 667–68, 461 S.E.2d at 173–74.

support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt."

By so holding, we overruled our prior cases [10] which applied the requirement the State's evidence must exclude *all* other reasonable hypotheses of innocence in circumstantial evidence cases. 194 W.Va. at 668, 461 S.E.2d at 174. *See Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150, 166 (1954); *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492, 502 (1991). We also recognized "there is no qualitative difference between direct and circumstantial evidence" and "[t]here should be only one standard of proof in criminal cases and that is proof beyond a reasonable doubt." 194 W.Va. at 669, 461 S.E.2d at 175.

■ Thus, when a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict.[11] This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt. The trial court's disposition of a motion for judgment of acquittal is subject to our *de novo* review; therefore, this Court, like the trial court, must scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt.

■ Applying these straightforward rules to this case, we make short drift of the defendant's claim. Reduced to its essence and viewed in a light most favorable to the prosecution, we find overwhelming evidence in support of the jury's verdict. The evidence demonstrates the defendant had a pattern of committing extreme acts of brutality upon Joshua leading up to the night he killed him. On the night of the murder, the defendant was frustrated with Joshua and began dropping him. The defendant did not drop him just once but picked him up and dropped him four to five times. After the child stopped crying, the defendant lit up a cigarette showing his initial unconcern about the condition of his son and then, instead of permitting his wife to get immediate medical care for Joshua, the defendant stopped her as she was going to call an ambulance and made her move the high chair so he would have an explanation for what happened. At some point when a neighbor was attempting to give Joshua CPR, both parents were standing beside the bed smoking cigarettes. Ms. Turner testified that neither parent showed any remorse or regret after being told of the death of their son and she found their response to be very inappropriate.

Given these facts, the jury easily could conclude beyond a reasonable doubt the defendant acted with premeditation and deliberation when he murdered Joshua. The State certainly established sufficient evidence of first degree murder for the issue to be submitted to the jury, thereby, preventing a motion for acquittal[12] or, in the alternative, a new trial[13] to be granted on this basis. Moreover, we find no merit in the defendant's reliance on Syllabus Point 5 of *Guthrie* which states:

**10.** *Citing State v. Robinette*, 181 W.Va. 400, 383 S.E.2d 32 (1989); *State v. Dobbs*, 163 W.Va. 630, 259 S.E.2d 829 (1979); *State v. Noe*, 160 W.Va. 10, 230 S.E.2d 826 (1976).

**11.** "[A] jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." Syl. pt. 3, in part, *Guthrie, supra*.

**12.** Rule 29(a) of the West Virginia Rules of Criminal Procedure provides that a judgment of acquittal should be granted "if the evidence is insufficient to sustain a conviction of such offense or offenses."

**13.** Under Rule 33 of the West Virginia Rules of Criminal Procedure, a court "may grant a new trial to [a moving] defendant if required in the interest of justice."

"Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed."

The jury reasonably could have determined: (1) the defendant formulated his intent to kill Joshua long before the night the murder occurred given the extremely violent way he historically treated the child [14]; or (2) the defendant formulated his intent to kill Joshua the evening the child died because the defendant became frustrated with him. In both these scenarios, the defendant had ample opportunity to reflect upon his intent to kill—which most acutely is evidenced by the fact he dropped Joshua four to five times on the floor, proceeded to allow the child to lie on the floor unattended while he lit up a cigarette, and then prevented his wife from immediately contacting an ambulance.

In addition, as a practical matter, premeditation generally can be proved only by circumstantial evidence. Because the defendant's mental processes are wholly subjective, it is seldom possible to prove them directly. If premeditation is found, it must ordinarily be inferred from the objective facts. Accordingly, if one voluntarily does an act, the direct and natural tendency of which is to destroy another's life, it fairly may be inferred, in the absence of evidence to the contrary, that the destruction of that other's life was intended.

### B.

*Mental Competency and Ineffective Assistance of Counsel*

In this assignment, we have combined several of the defendant's claims that are

relevant to his mental competency: (a) whether evidence relevant to his mental competency wrongfully was excluded; (b) whether the trial court erroneously refused the defendant's instruction concerning mental competency; and (c) whether trial counsel's handling of the mental competency issue constituted ineffective assistance of counsel. We find the first two perceived errors are intertwined and, thus, address these errors together. The ineffective assistance of counsel claim is addressed separately.

The defendant offered expert testimony from Dr. Clayman, a clinical psychologist, who stated the defendant suffers from mental illness which is difficult to label. Dr. Clayman opined the defendant has "a delusional thinking system, which means he thinks things that other people don't think that are not grounded in fact." Dr. Clayman also said the defendant at times may be "psychotic" meaning "his thought processes are not in touch with reality" and the defendant suffers a "personality disorder not otherwise specified[.]" At the time the defendant killed Joshua, Dr. Clayman believed "it is possible—that [the defendant] could have lost control to the point that he didn't even know what he was doing until after he did it." After Dr. Clayman gave this response, defense counsel asked Dr. Clayman whether "[a]t that moment in time, it is possible that [the defendant] could have been distressed enough that he would not have recognized his behavior." Before Dr. Clayman answered this question, the prosecutor objected and asked the previous response be stricken because it was based on a possibility instead of a reasonable degree of medical certainty or probability. A bench conference was held, the motion was granted, and Dr. Clayman's prior testimony was struck.

---

**14.** Although not an exclusive list, in note 24 of *Guthrie,* 194 W.Va. at 676, 461 S.E.2d at 182, we identified three categories of evidence which support a first degree murder conviction. These categories are:

"(1) 'planning' activity—facts regarding the defendant's behavior prior to the killing which might indicate a design to take life; *(2) facts about the defendant's prior relationship or be-*

*havior with the victim which might indicate a motive to kill;* and (3) evidence regarding the nature or manner of the killing which indicate a deliberate intention to kill according to a preconceived design." (Emphasis added).

The evidence clearly shows the defendant's prior relationship and behavior towards Joshua was exceedingly intolerant and hostile.

Defense counsel was permitted to vouch the record to preserve for appeal related testimony of Dr. Clayman. In relevant part, Dr. Clayman stated: "There's nothing in the records from Dr. Adamski or any other interview that said that [the defendant] had the intent at that time either premeditatedly or with malice to kill his child. There's nothing in the records of that." However, on cross-examination, Dr. Clayman said there was no indication the defendant suffered "delusional thinking or hallucinations" which commanded him to kill Joshua. In fact, the defendant, who either believed he "had spiritual contact with" or believed he was the reincarnation of Jack London, testified that Jack London did not tell him to kill Joshua. Moreover, on redirect, Dr. Clayman maintained it is impossible to really know about the defendant's mental illness at the time the incident actually occurred.

The State offered the expert testimony of Dr. Thomas R. Adamski, a psychiatrist, who opined to a reasonable degree of medical certainty that the defendant was competent to stand trial. Dr. Adamski further stated that "[i]n the matter of criminal responsibility regarding the acts of the alleged crime . . . [the defendant's] behaviors at that time were not fueled nor did they flow from a mental illness[,] . . . he was able to appreciate the wrongfulness of his behavior, and he could have conformed his conduct to the requirements of the law." Dr. Adamski made a diagnosis of "adjustment disorder with depressed mood" which he said was related somewhat to the defendant's incarceration. He further opined the defendant suffers from "schizotypal personality disorder" which he described as "a personality disorder" that is "not a major mental illness." On cross-examination, Dr. Adamski stated, although a person with "schizotypal personality disorder" may become angry without provocation, he believed, based upon interviews and other information, the defendant was able to control his anger.

First, the defendant contends that crucial evidence relevant to his lack of mental competency defense wrongfully was excluded by the trial court. The defendant believes that evidence regarding the "possibility" of his mental deficiency at the time of the killing should have been admitted. Thus, the defendant labors to convince us that Dr. Clayman's testimony was relevant for two reasons: First, it was relevant on the issue of "a delusional thinking system" and comprised a permissible opinion as to his mental state; and, second, it afforded the jury appropriate assistance in determining his intent. We are not persuaded.[15]

■ Under the West Virginia Rules of Evidence, expert testimony is admissible if a witness qualifies as an expert and the proffered testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" W.Va.R.Evid. 702. The decision to admit or reject expert evidence is committed to the sound discretion of a trial court, and the court's determinations are reviewable only for abuse of discretion. *Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 612, 390 S.E.2d 796, 811 (1990); *Rozas v. Rozas*, 176 W.Va. 235, 240, 342 S.E.2d 201, 206 (1986). Typically, appellate courts give trial judges a wide berth of respect with regards to these kinds of discretionary judgments. In note 6 of *Gentry v. Mangum*, 195 W.Va. 512, 520, 466 S.E.2d 171, 179 (1995), we made clear that an abuse of discretion standard is not appellant friendly:

"We review these rulings only for an abuse of discretion. Only rarely and in extraordinary circumstances will we, from the vista of a cold appellate record, reverse a circuit court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect. Our review, however, must have some purpose and that is why we review under the abuse of discre-

---

**15.** Appellate counsel for the defendant argues that even if this opinion testimony did not satisfy Rule 702 and was not admissible on the merits, it should have been admitted for sentencing purposes. Although the West Virginia Rules of Evidence do not apply to sentencing matters and proceedings, *see* W.Va.R.Evid. 1101(b)(3), the de-

fendant did not offer this evidence at trial for that limited purpose. Nor was the trial court ever requested to admit the testimony under the limited admissibility rule. *See* W.Va.R.Evid. 105. In the absence of such a request or offer, we deem the argument on limited admissibility forfeited.

tion standard. In general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them."

■ Viewed through this lens, the trial court's decision to exclude Dr. Clayman's testimony appears to be properly focused. The trial court's ruling to exclude the evidence could have been premised on the assumption that the testimony in its present form would not properly assist the jury. To be clear, expert testimony in the area of mental competency and mental responsibility is likely to help the jury and, hence, if sanctioned by the trial court, is admissible in evidence. We regularly uphold the admissibility of such expert testimony based upon a trial judge's belief that the evidence would help the jurors. On the other hand, we have suggested that evidence which is no more than speculation is not admissible under Rule 702:

"Of course, we do mean to suggest that in areas of nonscientific evidence an expert is not constrained by other requirements in Rule 702. As the Fourth Circuit said in *Newman v. Hy–Way Heat Systems, Inc.*,

789 F.2d 269, 270 (4th Cir.1986), 'nothing in the Rules appears to have been intended to permit experts to speculate in fashions unsupported by, and in this case indeed in contradiction of, the uncontroverted evidence.'" *Gentry*, [195] W.Va. at [527], 466 S.E.2d at 186.

■ In this instance, the trial court heard the evidence and granted a motion to strike the testimony. More significantly, trial counsel made no effort after the ruling to bring Dr. Clayman's testimony in line with Rule 702. On this record, there is no principled way for us to second guess that ruling; nor will we strain to do so. We find no support in the record for this empty and unilluminating conclusion. Viewed from this perspective, the testimony failed to provide a factual predicate for the jury, presumably inexperienced in evaluating mental illness, to draw the inference the defendant was incapable of intending the consequences of his actions.[16] We think Dr. Clayman's opinion would have been utterly confusing to the jury and conceivably also could have been excluded under Rule 403.[17]

■ In a related vein, the defendant argues the trial court should not have rejected his proposed instruction.[18] As a general

---

**16.** An expert opinion that is merely conclusory, even if couched in the language of the relevant legal standard, will be of little assistance to a trier of fact. *See, e.g., Rogers v. Evans,* 792 F.2d 1052, 1062 n. 9 (11th Cir.1986) (approving lower court's order striking affidavit of medical expert where the affidavit was "phrased in conclusory terms without citing facts," and concluding that the affidavit was "defective to create factual dispute").

**17.** We are not saying that Dr. Clayman's conclusion was wrong. Rather, we find his testimony does not aid in our analysis regarding the mental status of the defendant at the time of the killing. His testimony is not the kind of tool which indicates with any specificity the degree to which the defendant was mentally impaired.

**18.** The defendant requested the following jury instruction:

"Mental illness is generally never an excuse for a crime. However, where a certain state of mind or intent is an essential element of the crime, an accused is not guilty if, at the time of the commission of the alleged criminal act, he was suffering from a mental illness that rendered the defendant incapable to form the essential intent

or have the essential mental state. In this case, the defendant is charged with murder. The essential elements of murder are a specific intent to kill, acting with malice, premeditation and deliberation. The defendant contends at the time of the alleged offense, he was unable to form the essential intent or essential mental state of a specific intent to kill, acting with malice, premeditation and deliberation, because he was suffering from mental illness.

"If you find that the defendant was suffering from mental illness at the time of the alleged offense and as a result of that mental illness, the defendant was incapable of forming a specific intent to kill, or acting with malice, or premeditation, or deliberation, you must find the defendant not guilty of murder and may find the defendant guilty of no greater a crime than manslaughter.

"If you have any reasonable doubt as to whether or not the defendant was incapable of forming a specific intent to kill, or acting with malice, or premeditation, or deliberation, as a result of his mental illness, then you must find the defendant not guilty of murder and may find him guilty of no greater a crime than manslaughter."

rule, when reviewing a challenge to jury instructions, we consider the instructions given as a whole and not in isolation to determine whether the instructions adequately state the law and provide the jury with an ample understanding of the issues and the controlling principles of law. *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995). The legal propriety or correctness of a jury instruction is a question of law that we review *de novo*. Therefore, we give plenary review to a trial court's exclusion of a jury instruction where the rejection is based upon insufficient evidence as is the case here. *State v. Guthrie*, 194 W.Va. at 671, 461 S.E.2d at 177.[19]

The law is clear that an instruction should be given only when it addresses an issue reasonably raised by the evidence. *See Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54, 61 (1988). A failure to instruct a jury upon a legally and factually cognizable defense is not subject to harmless error analysis, but a defendant is entitled to a specific instruction on his theory of defense, not an abstract or general one that is not supported by evidence. *See State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987); *State v. Bennett*, 157 W.Va. 702, 203 S.E.2d 699 (1974).[20] This rule means that in criminal cases a defendant generally is entitled to a jury charge that reflects any defense theory for which there is a foundation in the evidence. *See State v. Phelps*, 172 W.Va. 797, 310 S.E.2d 863 (1983); *State v. Simmons*, 172 W.Va. 590, 309 S.E.2d 89 (1983).

From our cases, we learn that failure to give a proffered instruction is not necessarily *per se* error, but we must examine the facts of the case to determine the adequacy of the instructions as a whole and the effect of the omission on the defendant's

case under the three-part test announced in Syllabus Point 11 of *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994). Under that test, a refusal to give a requested instruction is an abuse of discretion if: (1) the instruction is correct and is supported by evidence; (2) the court did not address the substance of the instruction in its charge; and (3) the failure to give the instruction seriously impaired a defendant's ability to give an effective defense. It is on the last point that the defendant relies.

We agree with the State that the trial court's refusal to give this instruction was consistent with the evidence. After a careful review of the trial transcript, we can find no substantial evidence in the record that would justify the giving of this instruction. Indeed, we expressly find the record in this case is devoid of any evidence the defendant suffered a specific mental defect that would have rendered him incapable of forming a specific intent to kill at the time the mortal injuries were inflicted. Once the evidence discussed above was excluded by the trial court, the remaining evidence was insufficient to support the instruction. On appeal, the defendant even concedes he lacked sufficient evidence at trial. In support of his ineffective assistance of counsel claim, the defendant states in his brief that Dr. Clayman's and Dr. Adamski's reports "were available to counsel and were presumably made aware to the trial judge at the competency determination and boiled down to the fact that the only available defense to [the defendant] was 'rage' and he did not have adequate expert testimony to present at trial on such issue."

While the defendant's proffered instruction was more precise on the issue of intent, it contained language that was not

---

**19.** Our cases have not been consistent as to the proper standard by which to review "theory of defense" decisions. We are not alone in our vacillation. Our survey of the law in other courts reveals no clear consensus on the issue. *See United States v. Zuniga*, 6 F.3d 569, 570 (9th Cir.1993) (recognizing that both abuse of discretion and the *de novo* standard have been used in this context). At least in West Virginia, this

conflict now appears to have been resolved. *See Guthrie, supra*.

**20.** *Overruled on other grounds State v. Petry*, 166 W.Va. 153, 273 S.E.2d 346 (1980); *State v. Adkins*, 162 W.Va. 815, 253 S.E.2d 146 (1979); *State v. Ellis*, 161 W.Va. 40, 239 S.E.2d 670 (1977). *Adkins* later was overruled by *State v. Lassiter*, 177 W.Va. 499, 354 S.E.2d 595 (1987).

supported by the facts.[21] A defendant is not entitled to an instruction of his or her choice if the trial court otherwise adequately instructs the jury on the elements of the crime and any defense raised by the facts. In the present case, the trial court's instructions adequately reflected the controlling law at the time on the issues of intent, malice, premeditation, and deliberation. The jury was instructed on every element of the crime of murder. The jury also was told that the defendant was presumed innocent until the contrary was proved and this presumption placed upon the State the burden of proving beyond a reasonable doubt every material element of the crime. It also is significant that defense counsel's closing argument focused heavily on the issue of lack of specific intent to kill. Considering all the evidence presented, the evidence of lack of specific intent was relatively weak in relation to the prosecution's case. We, therefore, conclude on the evidence presented that the defendant was afforded a fair trial in this case and the overall jury charge adequately apprised the jury of the crime and the defense. His specific intent instruction was not given, but the instructions as a whole, in light of all the evidence in the case, were sufficient to afford due process under the standard by which we review alleged instructional error.

 Finally, in his claim for ineffective assistance of counsel, the defendant asserts the issues of competency and mental status were not developed adequately at trial. Specifically, the defendant claims ineffective assistance because his trial counsel failed to develop the defense of "rage" on the issues of competency, sanity, and mercy. Our cases demonstrate that counsel's performance is deficient if counsel fails to make a reasonable investigation for possible exculpatory or mitigating evidence in a first degree murder trial. *See State ex rel. Daniel v. Legursky,* 195 W.Va. 314, 465 S.E.2d 416 (1995) (the lawyer must make a significant effort, based on reasonable investigation, to represent a criminal defendant). After a reasonable tactical decision makes further investigation into a particular matter unnecessary, an attorney is not deficient in his or her duty to make a reasonable investigation by failing to further investigate and develop that matter. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674, 695 (1984) ("counsel has a duty to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary"). (Emphasis added). Indeed, all decisions of a trial counsel made after reasonable investigation are presumptively within the range of reasonable representation.

 The defendant's claim, as we understand it, is one in which trial counsel failed to fully *develop* the defense of rage. The same principles discussed above also apply here. If a "decision not to mount an all-out [defense] ... [is] supported by reasonable professional judgment," it is not ineffective assistance. *Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638, 657 (1987). A lawyer is not required to investigate and present every defense with the thoroughness of a biographer. The strong presumption that counsel's actions were the result of sound trial strategy, *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694–95, can be rebutted only by clear record evidence that the strategy adopted by counsel was unreasonable. We have no information as to why counsel downplayed this defense,· *if indeed he did.* Counsel might have felt that rage was not a recognizable defense; that the defense of rage if unsuccessful in obtaining an acquittal would be detrimental rather than beneficial in the sentencing phase; or that such evidence would undermine counsel's apparent strategy of painting the crime as a mere aberration in the life of a generally understanding father.[22] On the record before us,

---

**21.** Importantly, the trial court did not refuse to give a specific intent instruction. It was the language concerning mental illness that led to the rejection of the proffered instruction.

**22.** Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise probably would have won. Thus, the determinative issue is not whether the defendant's counsel was ineffective but whether he was thoroughly ineffective so that defeat was "snatched from the jaws of victory."

we can make no meaningful or firm decision that counsel did not make a reasonable tactical decision not to present such evidence.[23]

In *State v. Miller*, 194 W.Va. 3, 14, 459 S.E.2d 114, 125 (1995), we held it is inappropriate to give summary disposition of an ineffective assistance claim raised on direct appeal. We explained that "intelligent review is rendered impossible because the most significant witness, the trial attorney, has not been given the opportunity to explain the motive and reason behind his or her trial behavior." 194 W.Va. at 14–15, 459 S.E.2d at 125–26. (Footnote omitted). As we said in *Miller*, we cannot make an intelligent decision with regard to the merits of a defendant's claim of ineffective assistance "without an adequate record giving trial counsel the courtesy of being able to explain his trial actions." 194 W.Va. at 17, 459 S.E.2d at 128. The defendant is not foreclosed from developing his claim further on a post-conviction collateral attack, but "[t]he defendant must bear the resulting onus because [he] has the responsibility of proving ineffective assistance of counsel and of providing us with a sufficient record." 194 W.Va. at 17, 459 S.E.2d at 128. (Footnote omitted). If the defendant chooses to make a post-conviction collateral attack, he also may raise and proffer evidence with regard to other areas beyond the rage defense in which he claims his counsel was ineffective.

### C.

### *Evidentiary Issue: Rule 404(b)*

The defendant complains that inflammatory and prejudicial evidence which had little or no probative value was presented to the jury. During an *in camera* hearing held immediately before trial, the parties discussed the introduction of evidence regarding prior bad acts committed by the defendant. The defendant's position was that his conduct prior to the day Joshua died was irrelevant as to his state of mind and would not show his intent on that day. On the other hand, the prosecutor argued the evidence demonstrated a pattern of conduct that is probative of the issue of an accidental death. The prosecutor further stated:

> "I certainly disagree with [defendant's counsel] that it is irrelevant to determine why he did what he did on that particular night. That's going to be the crucial issue that this jury is going to have to determine as to what was intended when he dropped the baby. Was it an accident, or was it something that he, over a period of time, had developed the intent that he just had enough of this baby and that the abuse got progressively worse to the point that he killed it—deliberately killed that child? And that's what we're attempting to prove in the first degree murder."

After listening to the arguments of counsel, the trial court concluded the evidence was admissible because the prejudicial impact of the defendant's prior acts did not outweigh the probative value. Therefore, over the defendant's objection, the trial court presumably concluded that the evidence properly was admissible pursuant to Rule 404(b) of the West Virginia Rules of Evidence for the purpose of showing intent, motive, and the absence of accident for the crime alleged in the indictment. The defendant now labors to convince us that this testimony is inadmissible under the legal principles enunciated in both Rule 404(b) and Rule 403. Again, we are not persuaded.

The standard of review for a trial court's admission of evidence pursuant to Rule 404(b) involves a three-step analysis. First, we review for clear error the trial court's factual determination that there is sufficient evidence to show the other acts occurred. Second, we review *de novo* whether the trial court correctly found the evidence was admissible for a legitimate purpose. Third, we review for an abuse of discretion the trial court's conclusion that the "other acts" evidence is more probative than

---

**23.** In defining the required showing under the first prong of the *Strickland* analysis, the United States Supreme Court cautioned that a counsel's

conduct does not constitute ineffectiveness if it may be construed as the result of "tactical deci-

prejudicial under Rule 403.[24] *See State v. Dillon,* 191 W.Va. 648, 661, 447 S.E.2d 583, 596 (1994); *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *State v. Dolin,* 176 W.Va. 688, 347 S.E.2d 208 (1986).[25]

 This Court takes seriously claims of unfair prejudice. In *State v. McGinnis,* 193 W.Va. 147, 455 S.E.2d 516 (1994), we recognized the prejudice inherent in admitting evidence of other crimes. We suggested a defendant must be tried for what he or she did, not for who he or she is. Thus, guilt or innocence of an accused must be established by evidence relevant to the particular offense being tried, not by showing a defendant was engaged in other acts of wrongdoing. Nevertheless, there are times that "other crimes" evidence is admissible if a trial court can take adequate measures to guarantee the evidence will not be misused. In this context, it is presumed a defendant is protected from undue prejudice if the following requirements are met: (1) the prosecution offered the evidence for a proper purpose; (2) the evidence was relevant; (3) the trial court made an on-the-record Rule 403 determination that the probative value of the evidence is not substantially outweighed by its potential for unfair prejudice; and (4) the trial court gave a limiting instruction. *See Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771, 783–84 (1988); *United States v. Grissom,* 44 F.3d 1507, 1513 (10th Cir.), *cert. denied,* ─ U.S. ──, 115 S.Ct. 1720, 131 L.Ed.2d 579 (1995).

The case at hand fits neatly within this integument. After carefully scrutinizing the defendant's brief and giving the defendant all the benefit of doubt, we find he asserts error as to the first, second, and third of these requirements—namely, that evidence of prior bad acts was admitted for an improper purpose, was irrelevant, and was unfairly prejudicial under Rule 403. We address these arguments in turn.

 First, we believe the trial court admitted the challenged evidence for a proper purpose and it was relevant.[26] At trial, the defendant disavowed any criminal intent to kill the victim, Joshua. While he did not deny the acts leading to Joshua's death, his testimony was somewhat ambiguous. Two possible defenses emerge from his testimony—accidental death and what the defense labels as "rage."

 The prosecutor sought to demonstrate the defendant's intent (premeditation) and malice and the absence of accident by showing the defendant's acts of continued violence against his helpless and defenseless son. In addition to the clear and unambiguous language of Rule 404(b), our previous cases recognize the probative value of uncharged acts to demonstrate "intent" and "absence of mistake or accident." *State v. Berry,* 176 W.Va. 291, 342 S.E.2d 259 (1986) (evidence of prior bad acts, threats, against the victim to prove intent); *State v. Huffman,* 69 W.Va. 770, 73 S.E. 292 (1912) (evidence of other fires to prove fire was not accidental or caused by an incendiary). Moreover, the prior violence between the defendant and his son was relevant to show the nature of their relationship.[27] *State v.*

sions." 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. (Citation omitted).

24. Defense counsel objected before trial on the same grounds that the defendant raises on this appeal. Defense counsel explained the basis for his objection and received a definitive ruling from the trial court. Under our recent cases, defense counsel was not required to renew his objections at trial although the better practice would be to do so.

25. *Overruled on other grounds, State v. Edward Charles L.,* 183 W.Va. 641, 398 S.E.2d 123 (1990).

26. To be relevant, the evidence must relate to a matter which is in issue and must deal with conduct substantially similar and reasonably near in time to the offense for which the defendant is being tried. To determine whether the evidence is admissible for a proper purpose, a trial court must decide whether the evidence is probative of a fact of consequence other than character.

27. The theory underlying the introduction of evidence regarding a prior violent relationship in a murder prosecution is not that the assailant is a bad person and that bad people are likely to commit the charged offense. It is precisely this train of thought that Rule 404 prohibits. In-

*Smith,* 178 W.Va. at 108 n. 2, 358 S.E.2d at 192 n. 2 (1987); *State v. Headley,* 168 W.Va. 138, 142, 282 S.E.2d 872, 875 (1981). Therefore, we find the trial court did not abuse its discretion by ruling the evidence was admitted to show the defendant's intent, motive, malice, and the absence of accident.[28]

Second, the defendant argues even if the evidence was admitted for a proper purpose under Rule 404(b), it nevertheless failed to satisfy the balancing test of Rule 403. *See McGinnis, supra* (even if prior bad acts evidence satisfies Rule 404(b), trial court still must balance probative value and prejudicial effect under Rule 403). Specifically, the defendant argues that because the inflammatory acts complained of predated the death of the victim the probative value of the evidence substantially was outweighed by the danger of unfair prejudice. This assignment of error need not detain us long.

 The balancing of probative value against unfair prejudice is weighed in favor of admissibility and rulings thereon are reviewed only for an abuse of discretion. *See Guthrie, supra; Dillon, supra.* In consider-

ing the prejudicial effect of prior bad acts, we have eschewed any absolute or *per se* rules. Rather, this Court applies a reasonableness standard and examines the facts and circumstances of each case. This Court reviews disputed evidence in the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effects. *Guthrie, supra.* Unfair prejudice does not mean damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggests decision on an improper basis. *Derr, supra.* Applying this standard, we believe the trial court reasonably could have concluded that the proffered evidence was probative of a fact of consequence and was not unduly prejudicial. The evidence about the uncharged transactions involves the same type of conduct and occurred during the same time frame and in the same location and circumstances as the offense charged. Indeed, the acts complained of were so temporally close in time that they very well could be considered admissible independently of Rule 404(b) analysis.[29] Viewed in this light, the evidence is

stead, the theory under which such evidence is allowed arises from the idea that, when a defendant has demonstrated the same type of violence towards a victim on a recent occasion, it is probative of his or her intent, motive, malice, and premeditation. Thus, in the present case, the prosecutor understandably attempted to demonstrate some prior animosity to explain why the accused had a motive to do the illegal acts charged in the indictment. *See also* note 14, *supra.* Not only is evidence of the prior relationship between the defendant and his deceased son relevant, it also is considered crucial evidence in proving premeditation.

28. Although we believe the trial court failed to articulate precisely the purpose of this evidence under Rule 404(b), this failure is subject to harmless error analysis. *McGinnis, supra,* establishes the trial court's duties, but, if the purpose for admitting the evidence is apparent from the record and its admission is proper, the failure to follow *McGinnis* is harmless error. Our reading of the entire transcript reveals the relevance and apparent purposes for offering this evidence under Rule 404(b).

29. In determining whether the admissibility of evidence of "other bad acts" is governed by Rule 404(b), we first must determine if the evidence is "intrinsic" or "extrinsic." *See United States v. Williams,* 900 F.2d 823, 825 (5th Cir.1990): " 'Other act' evidence is 'intrinsic' when the evi-

dence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." (Citations omitted). If the proffer fits in to the "intrinsic" category, evidence of other crimes should not be suppressed when those facts come in as *res gestae*— as part and parcel of the proof charged in the indictment. *See United States v. Masters,* 622 F.2d 83, 86 (4th Cir.1980) (stating evidence is admissible when it provides the context of the crime, "is necessary to a 'full presentation' of the case, or is . . . appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the "res gestae" ' "). (Citations omitted). It seems doubtful this case could have been presented appropriately without showing when and how the young victim received the injuries that appeared on his body. Evidence the defendant was responsible for all the injuries to the victim would seem to " 'complete the story of the crime.' " *Masters,* 622 F.2d at 86. (Citation omitted). Indeed, evidence admissible for one of the purposes specified in Rule 404(b) and *res gestae* not always is separated by a bright line. *See United States v. Cook,* 745 F.2d 1311, 1317–18 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985).

not unrelated but integrally is connected to the criminal activity charged in the indictment. Evidence of the prior attacks and beatings not only demonstrated the motive and setup of the crime but also was necessary to place the child's death in context and to complete the story of the charged crime. We hold that historical evidence of uncharged prior acts which is inextricably intertwined with the charged crime is admissible over a Rule 403 objection.

Rule 403 was not intended to prohibit a prosecutor from presenting a full picture of a crime especially where the prior acts have relevance independent of simply proving the factors listed in Rule 404(b). Nor does Rule 403 force a prosecutor to eliminate details of a killing or the degree of malevolence exhibited by a defendant to his victim causing a victim's death. We find the testimony was so highly probative that any possible prejudice evaporated in comparison to it. Discerning no error, we hold the trial court acted within the realm of discretion in permitting the jury to hear and consider the contested testimony.

D.

*Bifurcation of Issue of Guilt and Mercy*

Here, the defendant raises his most significant issue, namely, that the consolidation of his case both as to the guilt and sentencing phases effectively denied him a fair trial. The defendant's pretrial motion for bifurcation was denied, and the trial court properly relied on W.Va.Code, 62–3–15 (1965).[30] The defendant now contends the statute is unconstitutional or, alternatively, it should be construed to permit discretionary bifurcation.

■ The constitutionality of W.Va.Code, 62–3–15, has been confirmed. *Billotti v. Dodrill,* 183 W.Va. 48, 394 S.E.2d 32 (1990);

*State ex rel. Leach v. Hamilton,* —— W.Va. ——, 280 S.E.2d 62 (1980); *Moore v. McKenzie,* 160 W.Va. 511, 236 S.E.2d 342 (1977); *State ex rel. Rasnake v. Narick,* 159 W.Va. 542, 227 S.E.2d 203 (1976). Further inquiry and evaluation of the statute's constitutionality hardly would be worth the effort, resources, and costs. Thus, we accept this Court's prior verdict on this issue as well as the judgment of our federal courts [31] that a unitary criminal trial in a first degree murder case meets muster under both the United States and West Virginia Constitutions. On the other hand, we cannot dismiss so easily the alternative contention of the defendant that we should construe the statute in such a way a trial court would have discretion to bifurcate the two stages of a criminal trial. The issue is one of construction of a statute and the Rules of Criminal Procedure; thus, our review of the trial court's ruling is plenary.

The issue we address is one of first impression in West Virginia. Our prior cases have dealt exclusively with the constitutionality of bifurcation and in each instance a solid majority has upheld its validity. *See Schofield v. West Virginia Dept. of Corrections,* 185 W.Va. 199, 406 S.E.2d 425 (1991); *Leach, supra* (Neely, J., dissenting); *Rasnake, supra* (Neely, J., and Wilson, J., dissenting). The language in *Leach* fairly sums up the tone of these cases: "A bifurcated proceeding may be preferable (although we think not); but it is not constitutionally imperative. A unitary jury trial under W.Va.Code, 62–3–15, is constitutional." —— W.Va. at ——, 280 S.E.2d at 65.

The judiciary, like every other institution, must be open to discarding habits that have outlived their usefulness and must bend under the pressures of modern life to find the

**30.** In relevant part, W.Va.Code, 62–3–15, states:
"If a person indicted for murder be found by the jury guilty thereof, they shall in their verdict find whether he is guilty of murder of the first degree or second degree.... [A]nd if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of said article twelve: Provided, however, That if the accused pleads guilty of murder of the first degree, the court may, in its discretion, provide that such person shall be eligible for parole in accordance with the provi-

sions of said article twelve, and, if the court so provides, such person shall be eligible for parole in accordance with the provisions of said article twelve in the same manner and with like effect as if such person had been found guilty by the verdict of a jury and the jury had recommended mercy."

**31.** *Billotti v. Legursky,* 975 F.2d 113 (4th Cir. 1992), *cert. denied,* 507 U.S. 984, 113 S.Ct. 1578, 123 L.Ed.2d 146 (1993).

most effective procedure in accomplishing its mission. Needless to say, efficiency cannot be permitted to prevail at the expense of justice. The obligation of the courts to deliver justice is paramount, and it may not be scrapped for the benefit of cheaper and more rapid dispositions. On the other hand, when enormous savings of expense and gains of efficiency can be accomplished without sacrificing justice, courts must adopt the procedure that produces the greater efficiency.

There can be no doubt that unitary trials are a valuable and important tool of judicial administration which especially is true when courts are overwhelmed with huge numbers of criminal cases and they involve consolidation of claims and issues that can be resolved primarily on the same facts. In such cases, consolidation permits the trial court to more effectively husband scarce resources and to meet its constitutional obligation to give all criminal defendants a speedy trial. If carefully and properly administered, as it was intended by the Legislature, consolidation of the issues of guilt and sentencing also is capable of producing, with efficiency and greatly reduced expense for all parties, a fairer, more rational, and evenhanded delivery of justice. It requires little imagination to recognize that without the ability to consolidate all jury issues the courts simply would be incapable of handling criminal litigation of any volume. The waste of time and expense involved in empaneling separate juries or even permitting the same jury to hear separately the same facts offered at the guilt phase over and over again is staggering.

■ If a trial court reaches the conclusion that a unitary trial will not impede justice, the trial court should take measures to assist the jury in comprehending the evidence for both issues of guilt and sentencing through the use of intelligent management devices. Such management devices include better organization of the evidence, allowing note taking by jurors, permitting counsel to more extensively use diagrams and charts so that evidence relevant to sentencing easily can be separated, interim explanations by the judge on issues of law and fact and on the limited use of the evidence, and even interim addresses to the jury by counsel.

■ On the other hand, neither the language of W.Va.Code, 62–3–15, logic, nor common sense compels us to hold a trial judge has no discretion to bifurcate trial in a first degree murder case. Recently, in *West Virginia Human Rights Commission v. Garretson*, 196 W.Va. 118, 124, 468 S.E.2d 733, 739 (1996), we stated: "As in any case of statutory construction, we must interpret the law to avoid constitutional conflicts, if the language of the law will reasonably permit such an avoidance." While our reading of W.Va. Code, 62–3–15, is that unitary trials are permitted, there is nothing in the statutory language that forbids bifurcation. It may well be true that unitary trials are adequate and appropriate in most cases, but it equally is clear that there are instances in which unitary trials perpetuate rather than limit the prejudice to the parties and the harm to the adversarial process. Accordingly, we hold that a trial court has discretionary authority to bifurcate a trial and sentencing in any case where the jury is required to make a finding as to mercy.

We believe awarding broad discretion to the trial court is most consistent with our mission of justice. Indeed, the ends of criminal justice would be defeated if mercy decisions were to be founded on a partial or speculative presentation of the facts. In her dissenting opinion in *Schofield*, 185 W.Va. at 207, 406 S.E.2d at 433, Justice Workman stated: "The determination of whether a defendant should receive mercy is so crucially important that justice for both the state and defendant would be best served by a full presentation of all relevant circumstances without regard to strategy during trial on the merits." Today's holding is consistent with Syllabus Point 3 of *State v. Bragg*, 160 W.Va. 455, 235 S.E.2d 466 (1977), where we stated: "The right to a bifurcated trial lies within the sound discretion of the trial court."

■ The motion to bifurcate may be made by either the prosecution or the defense. The burden of persuasion is placed upon the shoulders of the party moving for bifurcation. A trial judge certainly may insist on an explanation from the moving party as to why bifurcation is needed. If the ex-

planation reveals that the integrity of the adversarial process which depends upon the truth-determining function of the trial process would be harmed in a unitary trial, it would be entirely consistent with a trial court's authority to grant the bifurcation motion. In considering a motion to bifurcate, the court must balance the prejudice that the defendant or State may suffer from a unitary trial against the public's interest in judicial economy and efficiency.[32] Although it virtually is impossible to outline all factors that should be considered by the trial court, the court should consider when a motion for bifurcation is made: (a) whether limiting instructions to the jury would be effective; (b) whether a party desires to introduce evidence solely for sentencing purposes but not on the merits; (c) whether evidence would be admissible on sentencing but would not be admissible on the merits or vice versa; (d) whether either party can demonstrate unfair prejudice or disadvantage by bifurcation; (e) whether a unitary trial would cause the parties to forego introducing relevant evidence for sentencing purposes; and (f) whether bifurcation unreasonably would lengthen the trial. When a motion to bifurcate is made both sides must have an equal opportunity to present relevant evidence. The trial court may utilize whatever reasonable procedure deemed appropriate and efficient for the case at hand. *See* W.Va.R.Evid. 611(a).[33]

█ The decision to bifurcate involves mostly trial management; thus, the trial court has enormous discretion and rarely will its ruling constitute reversible error. To demonstrate that the trial court abused its discretion, a showing of "compelling prejudice" is required. "Compelling prejudice" exists where a defendant can demonstrate that without bifurcation he or she was unable to receive a fair trial regarding the finding of mercy and that the trial court could afford no

protection from the prejudice suffered. In short, this Court will grant relief only if the appellant can show prejudice amounting to fundamental unfairness.

█ We refuse to apply this new interpretation of W.Va.Code, 62–3–15, retroactively to include the defendant. The trial court, prosecution, witnesses, and jury have a great deal invested in the trial. The judge did nothing wrong by following established precedent. This case is not a situation in which "error" or an objection was brought to the judge's attention, and, *in face of contrary law,* the judge went the wrong way. Similarly, the error complained about is too speculative. Even today's decision may not have helped the defendant because the decision was a discretionary call for the trial judge. It is unfair to burden society with new trials or hearings where they were conducted fairly according to law, and subsequently were made questionable by an opinion of this Court, but the perceived errors have not been shown to affect the integrity of the proceedings. We emphasize our holding is driven primarily by the unique nature of our statutory provision and the important role a finding of mercy has in the administration of justice. Our analysis, therefore, is limited to the issue of mercy.

### E.

#### *Raise or Waive Rule*

The defendant has scattered throughout his brief numerous assignments of error that were not objected to in the trial court. Despite a plethora of recent cases holding these errors are unreviewable on direct appeal except under Rule 103(d) of the West Virginia Rules of Evidence, the defendant's brief fails to explain the effect of these alleged errors under plain error analysis.[34] Nevertheless,

---

**32.** In determining whether a party is prejudiced, a court should consider whether a jury could avoid cumulating all the evidence and segregate only the relevant and admissible evidence to the appropriate issue for which each piece of evidence was admitted.

**33.** Rule 611(a) provides as follows:
 "*Control by Court.*—The court shall exercise reasonable control over the mode and order of

interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

**34.** The defendant alleges three errors that we find were not properly objected to and preserved in the trial court and do not fall within the plain

we pause to discuss the "raise or waive" rule and to explain again why these issues do not merit serious appellate consideration.

" 'One of the most familiar procedural rubrics in the administration of justice is the rule that the failure of a litigant to assert a right in the trial court likely will result' in the imposition of a procedural bar to an appeal of that issue." *Miller*, 194 W.Va. at 17, 459 S.E.2d at 128, *quoting United States v. Calverley*, 37 F.3d 160, 162 (5th Cir.1994) (en banc), *cert. denied*, —— U.S. ——, 115 S.Ct. 1266, 131 L.Ed.2d 145 (1995). Our cases consistently have demonstrated that, in general, the law ministers to the vigilant, not to those who sleep on their rights. Recently, we stated in *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996): "The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." (Citation omitted). When a litigant deems himself or herself aggrieved by what he or she considers to be an important occurrence in the course of a trial or an erroneous ruling by a trial court, he or she ordinarily must object then and there or forfeit any right to complain at a later time. The pedigree for this rule is of ancient vintage, and it is premised on the notion that calling an error to the trial court's attention affords an opportunity to correct the problem before irreparable harm occurs. There is also an equally salutary justification for the raise or waive rule: It prevents a party from making a tactical decision to refrain from objecting and, subsequently, should the case turn sour, assigning error (or even worse, planting an error and nurturing the seed as a guarantee against a bad result). In the end, the contemporaneous objection requirement serves an important purpose in promoting the balanced and orderly functioning of our adversarial system of justice.

Of course, the raise or waive rule is not absolute. In *Miller*, we stated: "The 'plain error' doctrine grants appellate courts, in the interest of justice, the authority to notice error to which no objection has been made." 194 W.Va. at 18, 459 S.E.2d at 129. Under plain error, appellate courts will notice unpreserved errors in the most egregious circumstances. Even then, errors not seasonably brought to the attention of the trial court will justify appellate court intervention only where substantial rights are affected.

To satisfy the plain error standard, a court must find: (1) there was error in the trial court's determination; (2) the error was plain or obvious; and (3) the error affected "substantial rights" in that the error was prejudicial and not harmless. 194 W.Va. at 18, 459 S.E.2d at 129, *citing United States v. Olano*, 507 U.S. 725, 730–32, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518 (1993). If these criteria are met, this Court may, in its discretion, correct the plain error if it " 'seriously affect[s] the fairness, integrity or public rep-

---

error rule. First, the defendant argues he was denied a panel of qualified jurors. He states that two jurors failed to indicate they served as jurors the last term and a third juror did not indicate he was acquainted with the defendant. Not only do we conclude the defendant waived his argument with regard to the third juror because it was not properly developed and argued in his brief, *see* note 7, *supra*, but we also find the defendant waived his complaints about the jury panel because defense counsel specifically told the trial court "the panel is acceptable to the defense."

Second, the defendant asserts the trial court erred by allowing Dr. Sopher to testify beyond his expertise as the Chief Medical Examiner. Specifically, the defendant states Dr. Sopher testified about Joshua's preexisting injuries and recognized the case as "a classic case of an abused child." However, the only objections raised during Dr. Sopher's testimony were a relevancy objection made when the prosecutor asked Dr. Sopher if a child Joshua's age would suffer symptoms from a preexisting skull fracture and an objection to the admission of the diagrams detailing Joshua's injuries, *see* note 7, *supra*. The defendant did not object on the basis that Dr. Sopher was testifying beyond his expertise.

Third, the defendant argues the "trial court erred in failing to admonish the jury to discard certain remarks made by the prosecutor in his closing statement which such remarks were improper, inflammatory and prejudicial." During closing, defense counsel did object three times to comments the prosecutor made, and the trial court sustained each objection. However, defense counsel never asked the trial court to admonish the jury; thus, we find such alleged error was waived.

utation of judicial proceedings.'" *Olano,* 507 U.S. at 732, 736, 113 S.Ct. at 1776, 1779, 123 L.Ed.2d at 518, 521, *quoting United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 (1936).

As we suggested in *Miller,* an unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that "'seriously affect the fairness, integrity or public reputation of the judicial proceedings.'" *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985). (Citation omitted).

Thus, both *Miller* and *Olano* treat the three prerequisites as necessary but not sufficient to empower an appellate court to correct a trial error. Even when all three prerequisites are established, whether to correct error remains discretionary with the appellate court. *Olano* instructed us on the criteria for the exercise of this discretion. We should correct error which caused a "miscarriage of justice," that is, conviction of an innocent person. Aside from preventing such miscarriages of justice, the standard to apply is whether the error "'seriously affect[s] the fairness, integrity or public repu-

tation of judicial proceedings.'" *Olano,* 507 U.S. at 736, 113 S.Ct. at 1779, 123 L.Ed.2d at 521. (Citation omitted). The *Olano/Atkinson/Miller* standard requires a case-by-case exercise of discretion.

We carefully have reviewed all errors not objected to below and conclude that none of them can or should be brought under plain error. Indeed, most of the unpreserved assignments are not errors at all and the rulings thereon would be affirmed under any standard of review. We express no opinion as to whether these assignments later may be brought under an ineffective assistance of counsel claim. Our holding is a narrow one limited only to plain error.

## III.

### CONCLUSION

Finally, we have reviewed the other assignments of error not discussed above but raised by the defendant and find them to be without merit.[35] Finding no reversible error, we, therefore, affirm the final order of the Circuit Court of Fayette County.

Affirmed.

---

**35.** The defendant contends his wife's testimony violated both W.Va.Code, 57-3-3 (1923), and W.Va.Code, 57-3-4 (1923). We disagree. The wife testified as to the abusive conduct of the defendant. The marital competency rule expressly permits testimony against a spouse where a child of either spouse is the victim of the crime. *See State v. Malick,* 193 W.Va. 545, 549, 457 S.E.2d 482, 486 (1995). Also, the spousal communication privilege has no application to conduct which is not intended as confidential between the spouses. *See State v. Robinson,* 180 W.Va. 400, 376 S.E.2d 606 (1988). The fact another person, in this case the child, was present prevents application of the privilege.

The defendant's contention that Ms. Turner's testimony was barred by *Miranda* also is misplaced. Ms. Turner was a Social Service Supervisor for the Department of Health and Human Resources. In *Minnesota v. Murphy,* 465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409,

423 (1984), a similar issue was raised, and the Supreme Court found the element of custody was lacking in these types of conversations:

"Custodial arrest is said to convey to the suspect a message that he has no choice but to submit to the officers' will and to confess.... [T]he coercion inherent in custodial interrogation derives in large measure from an interrogator's insinuations that the interrogation will continue until a confession is obtained.... Since Murphy was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting ... was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." (Citations and footnote omitted).

Thus, we find there was no custody and there was no requirement to give *Miranda* warnings.