691 S.E.2d 183

**STATE of West Virginia ex rel. Vernon H. DUNLAP, Sr., Petitioner Below, Appellant,**

v.

**Thomas McBRIDE, Warden, Respondent Below, Appellee.**

No. 34808.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 27, 2010.

Decided March 4, 2010.

Eric S. Black, Berkeley Springs, WV, for Appellant.

Darrell V. McGraw, Jr., Attorney General, Robert D. Goldberg, Assistant Attorney General, Charleston, WV, for Appellee.

PER CURIAM:

Vernon H. Dunlap, Sr. (hereinafter "Mr. Dunlap") appeals from an order of the Circuit Court of Jefferson County that denied his petition for habeas corpus relief. Mr. Dunlap filed the habeas petition subsequent to the denial of his appeal of his conviction for first degree murder and sentence to life imprisonment without the possibility of parole. In this habeas appeal, Mr. Dunlap assigns the following as error: (1) he was denied effective assistance of counsel during his trial; (2) the trial was improperly bifurcated; (3) evidence was improperly admitted during the penalty phase of the trial; and (4) a conflict of interest existed with his former counsel. After a careful review of the briefs and the record submitted on appeal, we affirm.

1. There was trial testimony that Ms. Dodson actually ended the relationship on February 17, 2004.

2. The State's brief references to trial transcript testimony by Ms. Sisk. However, the trial transcript referenced by the State has not been made a part of the record on appeal. Further, in this Court's review of the trial testimony by Kenneth Robinson, he testified that Ms. Sisk's child was at

I.

## FACTUAL AND PROCEDURAL HISTORY

On the evening of February 18, 2004, Jennifer Leah Dodson (hereinafter "Ms. Dodson") invited her sister, Crystal Dodson, and her sister's boyfriend, Kenneth Robinson, to her apartment to look at some pictures. Ms. Dodson and her infant daughter lived in Shepherdstown, West Virginia. When Crystal and Kenneth arrived at the apartment complex parking lot, they were met by Mr. Dunlap. Although Mr. Dunlap had not been invited to Ms. Dodson's apartment, he entered the apartment with Crystal and Kenneth. Mr. Dunlap and Ms. Dodson had previously dated, but Ms. Dodson wanted to end the relationship.[1] Crystal and Kenneth left Ms. Dodson's apartment at around 10:00 p.m. Mr. Dunlap remained at the apartment. According to the State's brief, at around 10:45 p.m., Jamie Sisk and her infant son arrived at Ms. Dodson's apartment. Ms. Sisk worked at night so she brought her infant son for Ms. Dodson to baby-sit.[2] At around 11:15 p.m., a neighbor of Ms. Dodson, Christy Miller, arrived home. Ms. Miller testified that she saw Mr. Dunlap's pickup truck in the apartment complex parking lot when she arrived.

In the early morning hours of February 19, 2004, Ms. Sisk returned to Ms. Dodson's apartment to pick up her child. However, Ms. Sisk could not get Ms. Dodson to answer the door.[3] Consequently, Ms. Sisk drove to Crystal's residence to get Crystal's spare key to Ms. Dodson's apartment. After retrieving the key, Ms. Sisk returned to Ms. Dodson's apartment. She could not get the key to work. Ms. Sisk again drove to Crystal's residence. This time, Crystal and Kenneth[4] decided to accompany Ms. Sisk back to Ms.

Ms. Dodson's home while he and Crystal were still there.

3. Ms. Sisk could hear her son and Ms. Dodson's daughter making noise in the apartment.

4. Kenneth was at Crystal's home when Ms. Sisk arrived there.

Dodson's apartment. It was almost 9:00 a.m. when Crystal, Kenneth, and Ms. Sisk arrived at Ms. Dodson's apartment. Crystal was able to open the door to the apartment. When she, along with Kenneth and Ms. Sisk entered the apartment, Ms. Dodson's lifeless body was found lying on the floor. Ms. Dodson's throat had been slashed, and she had bled to death.[5] Kenneth made a 911 emergency call to summon the police and paramedics.

About an hour before Ms. Dodson's body was found, the Jefferson County Ambulance Authority received a 911 call regarding an unconscious man who was slumped over in a pickup truck near a Shepherdstown boat ramp. Paramedics and Deputy M. Dumer arrived at the scene. The authorities learned that the unconscious man in the pickup truck was Mr. Dunlap. After Mr. Dunlap was taken to a hospital, it was learned that he had taken an overdose of drugs.

About two hours after Deputy Dumer responded to the 911 call involving Mr. Dunlap, he was instructed to respond to the emergency at Ms. Dodson's apartment. While at Ms. Dodson's apartment, Deputy Dumer overheard other police officers discussing Mr. Dunlap as a boyfriend of Ms. Dodson. Based upon that information, Deputy Dumer arranged to have Mr. Dunlap's pickup truck held for further investigation and the issuance of a search warrant.

In September 2004, a grand jury indicted Mr. Dunlap on a one count indictment for murder in the first degree. Mr. Dunlap's trial was held in April 2005. During the trial, the State presented four witnesses who testified that Mr. Dunlap confessed to them that he killed Ms. Dodson. One of the witnesses was Mr. Dunlap's twenty-year-old daughter, Tabitha Sanders. The jury ultimately convicted Mr. Dunlap of murder in the first degree. The jury did not recommend mercy. Consequently, the trial court sentenced Mr. Dunlap to life imprisonment without the possibility of parole. Mr. Dunlap filed a petition for appeal with this Court. It was denied.

Subsequent to the denial of Mr. Dunlap's petition for appeal, he filed a habeas corpus petition seeking to obtain a new trial.[6] An omnibus evidentiary hearing was held by the trial court. During the habeas hearing, Mr. Dunlap sought to establish ineffective assistance of counsel on various grounds. Mr. Dunlap also argued that he was entitled to a new trial because his trial was improperly bifurcated, evidence was improperly admitted during the penalty phase of the trial, and a conflict of interest existed with his former court-appointed counsel. At the conclusion of the hearing, the trial court denied the petition for habeas relief. This appeal followed.

## II.

### STANDARD OF REVIEW

In this appeal, we are called upon to review the trial court's denial of Mr. Dunlap's petition for habeas corpus relief. The trial court's order set out findings of fact and conclusions of law. This Court has previously held that "[f]indings of fact made by a trial court in a post-conviction habeas corpus proceeding will not be set aside or reversed on appeal by this Court unless such findings are clearly wrong." Syl. pt. 1, *State ex rel. Postelwaite v. Bechtold*, 158 W.Va. 479, 212 S.E.2d 69 (1975). We have explained more fully that,

[i]n reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

Syl. pt. 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006). With these standards in mind, we now consider the issues presented in this appeal.

## III.

### DISCUSSION

As previously discussed in this opinion, Mr. Dunlap sets forth four assignments of

---

5. Ms. Dodson's daughter and Ms. Sisk's son were not injured.

6. Counsel was appointed to represent Mr. Dunlap at the habeas proceeding.

error. Each assertion will be reviewed individually.

### A. Ineffective Assistance of Counsel Claims

■■■ Mr. Dunlap has asserted several issues that he claims constituted ineffective assistance of counsel. This Court has held that,

[i]n the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. pt. 5, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995). The decision in *Miller* further held that,

[i]n reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. pt. 6, *Miller, id.* Applying the *Miller standards,* we will review each of the ineffective assistance of counsel claims made by Mr. Dunlap.

**■ 1. Failure to have forensic testing performed on certain evidence.** Mr. Dunlap contends that his trial counsel was ineffective in failing to have forensic testing performed on certain evidence collected during the investigation of the case. The evidence included two knives, a bloody shoe print, and a bloody hand print found at Ms. Dodson's apartment. During the habeas proceeding, Mr. Dunlap's trial counsel testified that he did not have forensic testing done for two reasons. First, trial counsel had obtained a stipulation from the State that no crime scene evidence directly linked Mr. Dunlap to the killing. Second, trial counsel was afraid that the forensic testing might implicate Mr. Dunlap. Defense counsel testified to the latter decision as follows:

Well, first of all as to the knives—well, I'll just go through that. We weren't sure if there was blood on them to begin with. They weren't in evidence. I could really argue that the state, you know, dropped the ball. There's somebody else involved. I was afraid of—one of the fears is you have them tested, you find your defendant's DNA on them, or you find a link to the defendant and there was no link whatsoever to link Vernon Dunlap to this killing. I really didn't want to go out and try to manufacture any.

■ We do not believe that trial counsel was ineffective in failing to have forensic testing performed on the above-stated evidence. We have held that, "[w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused." Syl. pt. 21, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

In the instant case, trial counsel extracted a stipulation from the State, which was made known to the jury, that no crime scene evidence linked Mr. Dunlap to the killing. Insofar as no crime scene evidence linked Mr. Dunlap to the crime, trial counsel made a strategic decision not to risk linking Mr. Dunlap to the crime through forensic testing. Mr. Dunlap's daughter and three other witnesses testified that he confessed to them that he killed Ms. Dodson. Defense counsel had a reasonable basis to believe that forensic testing of the evidence might implicate Mr. Dunlap in the killing. This precise issue was addressed in *Jackson v. State,* 770 A.2d 506, 513 (Del.2001).

In *Jackson,* the defendant was convicted of capital murder and sentenced to death. One of the issues raised by the defendant in a habeas attack on the conviction and sentence

was that trial counsel was ineffective in not having forensic testing performed on certain crime scene evidence. It was said in *Jackson* that trial counsel chose to forego forensic testing of evidence especially because counsel believed such evidence might not be favorable to the defendant, in view of the strong evidence the State had against the defendant. The Delaware Supreme Court quoted the trial court's finding on this issue as follows:

> The Superior Court correctly found that "[f]aced with this evidence, it was not improper for counsel to forgo further forensic testing of the crime scene evidence. Rather, the Court concludes that counsel made a reasonable tactical decision to forgo such testing in order to focus their efforts on creating a reasonable doubt about Jackson's guilt."

*Jackson,* 770 A.2d at 513.

Clearly, the evidence supported the trial court's finding that Mr. Dunlap's trial counsel was not ineffective by failing to have forensic testing performed.

**■ 2. Failure to adequately investigate the case.** Mr. Dunlap contends that his trial counsel failed to properly investigate his case. There are two issues involved with this matter.[7] First, Mr. Dunlap argues that his trial counsel should have done an investigation of Steve Fogle, the father of Ms. Dodson's daughter. Prior to trial, the police investigated Mr. Fogle and determined that he was living in North Carolina at a shelter in the Salvation Army Center. The police investigation revealed that Mr. Fogle signed into the shelter the day prior to and after the killing.

**■** The second issue raised by Mr. Dunlap is that trial counsel should have investigated Scott Marshall and Brian Walls. Mr. Marshall and Mr. Walls were incarcerated with Mr. Dunlap in the regional jail while his trial was pending. Mr. Marshall had contacted the State and informed the State that Mr. Dunlap confessed to him that he killed Ms. Dodson. However, prior to trial, Mr. Dunlap received a letter from Mr. Marshall,

wherein Mr. Marshall stated that Mr. Walls had informed him that someone said he was going to testify against him. Mr. Marshall stated in the letter that this was not true because he did not even know Mr. Dunlap. Notwithstanding the letter, Mr. Marshall testified at trial that Mr. Dunlap confessed to him that he killed Ms. Dodson.

Mr. Dunlap contends that, had the trial counsel properly investigated Mr. Fogle's alibi, as well as Mr. Marshall and Mr. Walls, the outcome of the trial could have been different. The habeas trial court disagreed as follows:

> With regard to the Fogle issue, it seems that the strategy here was "to leave the door of reasonable doubt open and suggest the police investigation of the death was inadequate." That is not an unreasonable strategy to take given the lack of physical evidence, the circumstantial nature of the State's case, and the theory of the defense.... With regard to the issue pertaining to Scott Marshall letter and [Walls], the Court is concerned that trial counsel did not confront Marshall with the same for impeachment purposes, although the Court concedes that trial counsel had done a pretty good job of impeaching Marshall by exploring his own crime and possible hopes of leniency if he cooperated with the State. Nevertheless, even if the Court considers this to be deficient performance, there is absolutely no evidence of any reasonable probability that, but for such performance, the result of the trial would have been different, especially since three other witnesses testified that [Mr. Dunlap] had confessed the crime to them.

**■** We find no abuse of discretion in the disposition of this issue. Like the trial court, we have concerns with how Mr. Dunlap's counsel handled the investigation of Mr. Marshall and Mr. Walls. However, merely finding that counsel's performance may have been deficient on an issue does not afford a defendant habeas relief. It must also be shown that there is "a reasonable probability that, but for counsel's unprofessional errors,

7. Under this assignment of error, Mr. Dunlap also restated his contention that trial counsel should have had forensic testing performed on evidence. We have already determined that the trial court's ruling on this issue was not error.

the result of the proceedings would have been different." *State ex rel. Waldron v. Scott*, 222 W.Va. 122, 128, 663 S.E.2d 576, 582 (2008) (internal quotations and citation omitted). As the trial court noted, had Mr. Marshall been impeached with his letter denying Mr. Dunlap confessed to him, the State still had three other witnesses who testified that Mr. Dunlap confessed to them. More importantly, one of the witnesses was Mr. Dunlap's daughter.

**■ 3. Failure to request a change of venue.** Mr. Dunlap next argues that his trial counsel should have requested a change of venue because of the case's extensive media coverage.[8] The habeas trial court summarily disposed of this issue as having no merit. The trial court found:

This ground appears to be founded in pure speculation. The ultimate test is whether or not a fair and impartial jury can be empaneled. A review of the transcript indicates that there was no particular difficulty in this case in putting together venire panels of regular and alternate jurors.

■ We agree with the trial court in finding that, other than the statement that there was extensive media coverage of the case prior to trial, Mr. Dunlap has failed to provide any evidence of any unusual difficulties in selecting an impartial jury. This Court has previously held that "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl. pt. 1, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982).

**■ 4. Failure to sufficiently meet with Mr. Dunlap.** The final ineffective as-

sistance of counsel claim raised by Mr. Dunlap, is that trial counsel failed to meet with him on a sufficient basis to prepare for trial. The habeas trial court determined that this issue was meritless based upon the following:

The only evidence pertaining to this ground was elicited from Trial Counsel. Craig Manford testified that he had approximately a dozen phone conferences with [Mr. Dunlap]; that he met with [Mr. Dunlap] in person at least a dozen times; that [Mr. Dunlap] seemed to understand and approve of the trial strategy; and that Mr. Manford perceived that he had a pretty good working relationship with [Mr. Dunlap].

Mr. Dunlap has failed to provide any evidence of trial counsel's failure to adequately meet with and prepare him for trial. Mr. Dunlap's "claim of ineffective assistance of counsel [on this issue] amounts to nothing more than general and bare allegations without any analysis[.]" *State ex rel. Hatcher v. McBride*, 221 W.Va. 760, 766, 656 S.E.2d 789, 795 (2007).

**B. The Trial Was Improperly Bifurcated**

■ The next issue raised by Mr. Dunlap is that he was deprived of a fair trial because the State was allowed to bifurcate the trial after it started. The record in this case indicates that, prior to trial, the circuit court ruled that the State would be able to present evidence in its case-in-chief that Mr. Dunlap previously tried to slash the throat of his former wife, Betty Yates, and that he was incarcerated for over two years for stabbing Ms. Yates.[9] Once the trial began, the State moved the court to permit it to introduce additional prior bad acts by Mr. Dunlap against Ms. Yates. The trial court denied the motion as untimely Rule 404(b) evidence.[10] The State then asked the court to

---

8. Mr. Dunlap also contends that trial counsel should have conducted a community sentiment survey.

9. Prior to allowing evidence of this specific prior bad acts conduct by Mr. Dunlap, the trial court held a hearing as required by *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

10. Rule 404(b) of the West Virginia Rules of Evidence states the following:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pre-

bifurcate the trial so that the additional prior bad acts conduct could be used during the sentencing phase. The trial court denied the motion to bifurcate. However, once Ms. Yates began to testify, the State again asked the trial court to bifurcate the trial. The court took the motion under advisement. After Mr. Dunlap put on his case-in-chief, the State called rebuttal witnesses. During the State's rebuttal, it again asked the court to bifurcate the trial. The court ultimately ruled that it would permit the case to be bifurcated. In so doing, the trial court gave Mr. Dunlap several days to prepare for a sentencing hearing before the jury.

The habeas court found that the decision to bifurcate was a discretionary matter and "that the effort to bifurcate did not come as a surprise to the Defense, although the timing created some practical difficulties even though the Court recessed proceedings for several days."

 We have held that "[a] trial court has discretionary authority to bifurcate a trial and sentencing in any case where a jury is required to make a finding as to mercy." Syl. pt. 4, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996). The decision in *LaRock* listed a number of nonexclusive factors that a trial court may consider in deciding whether to allow bifurcation of a criminal trial:

> Although it virtually is impossible to outline all factors that should be considered by the trial court, the court should consider when a motion for bifurcation is made: (a) whether limiting instructions to the jury would be effective; (b) *whether a party desires to introduce evidence solely for sentencing purposes but not on the merits;* (c) *whether evidence would be admissible on sentencing but would not be admissible on the merits or vice versa;* (d) whether either party can demonstrate unfair prejudice or disadvantage by bifurcation; (e) *whether a unitary trial would cause the parties to forego introducing relevant evidence for sentencing purposes;*

and (f) whether bifurcation unreasonably would lengthen the trial.

Syl. pt. 6, *LaRock id.* (emphasis added).

It is clear that the *LaRock* factors are concerned with a party being able to present evidence for sentencing that may not be admissible on the merits of a prosecution. In this case, the State had a considerable amount of additional bad acts evidence involving Mr. Dunlap that may not have been admissible during the guilt phase, even if the State had timely brought the evidence to the court's attention. However, this evidence was highly relevant as to the decision of whether Mr. Dunlap should receive mercy and obtain a sentence that would allow him to be eligible for parole. Ultimately, we agree with the trial court that "there is no evidence that would lead [us] to conclude that the bifurcation herein was constitutional error." More importantly, Mr. Dunlap has not articulated any plausible prejudicial effect from bifurcation.

### C. Evidence Was Improperly Admitted During the Penalty Phase of the Trial

 During the sentencing hearing, the State called Mr. Dunlap's former wife, Betty Yates, to introduce evidence of other bad acts. Ms. Yates testified about numerous incidents of violent conduct by Mr. Dunlap toward her and their children. Mr. Dunlap contends that he was denied a fair sentencing hearing because the State was permitted to introduce such evidence without the trial court conducting a hearing pursuant to *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

 In *McGinnis*, this Court set out the following standard for determining the admissibility of evidence of other bad acts by a defendant:

> Before admitting the evidence, the trial court should conduct an in camera hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a prepon-

trial notice on good cause shown, of the general nature of any such evidence it intends to

introduce at trial.

derance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

Syl. pt. 2, in part, *McGinnis*, 193 W.Va. 147, 455 S.E.2d 516. The habeas trial court held that a *McGinnis* hearing and admissibility determination is only necessary during the guilt phase of a trial. The court correctly found that "[t]his evidence was not heard during the 'guilt phase,' so it did not go to the question of guilt, but rather to the question of the penalty." We agree with the habeas court.

■■■■ Mr. Dunlap has failed to cite to any decision of this Court where we have required a *McGinnis* hearing for sentencing purposes only. As a general matter, "[t]he rules of evidence, including Evid.R. 404(b) regarding 'other acts,' do not strictly apply at sentencing hearings." *State v. Combs*, No. CA2000–03–047, 2005 WL 941133, at *2 (Ohio Ct.App.2005). *See Patton v. State*, 25 S.W.3d 387, 392 (Tex.App.2000) ("It has been held that Rule 404(b) does not apply to the penalty or punishment phase of a bifurcated tri-

al."). Moreover, "[a] trial court has wide discretion in the sources and types of evidence used in determining the kind and extent of punishment to be imposed. And a sentencing court is not restricted by the federal constitution to the information received in open court." *Elswick v. Holland*, 623 F.Supp. 498, 504 (S.D.W.Va.1985) (citations omitted). Therefore, we find this issue to be without merit.

### D. Former Counsel Had a Conflict of Interest

The final issue raised by Mr. Dunlap is that he was denied a fair trial because one of his former trial counsel had a conflict of interest. Prior to Mr. Dunlap being indicted, the trial court appointed the law firm of James Kratovil and Aaron Amore to represent Mr. Dunlap.[11] Mr. Amore was appointed on April 8, 2004. At the request of Mr. Amore, Mr. Kratovil was appointed on April 20, 2004. On or about August 31, 2004, the prosecutor contacted Mr. Amore and informed him that an inmate represented by Mr. Kratovil, Scott Marshall, was going to be called by the State to testify against Mr. Dunlap. Specifically, Mr. Marshall was going to testify that Mr. Dunlap confessed to killing Jennifer Dodson. Subsequently, Mr. Amore filed a motion to withdraw himself and the firm of Kratovil & Amore from the case.[12] The trial court granted the motion to withdraw on September 2, 2004. On September 22, 2004 the grand jury indicted Mr. Dunlap on a one-count indictment for first degree murder.

Even though Mr. Kratovil withdrew from his representation of Mr. Dunlap, he continued to represent Mr. Marshall. In fact, Mr. Kratovil negotiated the agreement by which Mr. Marshall would testify for the prosecutor, in return for leniency in the charges pending against him.[13] During Mr. Dunlap's

---

**11.** Prior to the appointment of Mr. Kratovil and Mr. Amore, another attorney was appointed to represent Mr. Dunlap. However, the initial counsel withdrew because of a conflict of interest.

**12.** Mr. Amore's motion to withdraw indicated that, in addition to Mr. Marshall, another witness

he represented was also going to testify against Mr. Dunlap.

**13.** It appears that the Lawyer Disciplinary Board eventually found that both Mr. Amore and Mr. Kratovil violated their duty of loyalty to Mr. Dunlap. However, the Board did not find that either attorney breached their duty of confidentiality to Mr. Dunlap. *See Nix v. Whiteside*, 475

trial, Mr. Marshall testified that, while in jail together, Mr. Dunlap confessed to him that he killed Ms. Dodson.

In the habeas proceeding, Mr. Dunlap contended that the conflict of interest with Mr. Kratovil prejudiced his defense.[14] The trial court rejected this contention on the grounds that "[t]here appears to be no evidence of the sharing of sensitive information, because none was presented by [Mr. Dunlap] at the evidentiary hearing." We agree with the habeas trial court's rejection of this issue.

■■■■ The first matter that must be clearly understood is that the issue raised by Mr. Dunlap does not fall under the "presumed prejudice" case law, which addresses the issue of ineffective assistance of counsel involving an actual conflict of interest by trial counsel. Under state and federal constitutional law, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler v. Sullivan*, 446 U.S. 335, 349–350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980). "To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised." *State v. Larzelere*, 979 So.2d 195, 208 (Fla.2008) (quoting *Sliney v. State*, 944 So.2d 270, 279 (Fla.2006)). This Court has indicated that,

> [t]he Sixth Amendment is implicated only when the representation of counsel is adversely affected by an actual conflict of interest. When counsel for a defendant in a criminal case has an actual conflict of interest when representing the defendant and the conflict adversely affects counsel's performance in the defense of the defendant, prejudice to the defense is presumed and a new trial must be ordered."

*State ex rel. Blake v. Hatcher*, 218 W.Va. 407, 414 n. 4, 624 S.E.2d 844, 851 n. 4 (2005) (quoting *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir.1991 (emphasis omitted))).

U.S. 157, 165, 106 S.Ct. 988, 993, 89 L.Ed.2d 123 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.").

In the instant case, the alleged conflict of interest does not involve trial counsel. Mr. Dunlap's claim of conflict of interest involves a former counsel, Mr. Kratovil, who withdrew from representing him prior to his indictment. Under the unique facts of this case, we do not believe that the "presumed prejudice" that flows from a showing of an actual conflict applies. At best, the issue raised by Mr. Dunlap involves a potential conflict of interest.

■■■■ It has been recognized that "[t]he mere possibility of a conflict of interest is insufficient to impugn a criminal conviction." *State v. Manross*, 40 Ohio St.3d 180, 532 N.E.2d 735, 737 (1988). A defendant seeking to overturn a conviction based upon a potential conflict "will be entitled to a new trial only if he can establish 'material prejudice' to his defense resulting from the alleged conflict." *Commonwealth v. Mosher*, 455 Mass. 811, 920 N.E.2d 285, 297 (2010).

■■■■ In this appeal, as was the same below, all that Mr. Dunlap's brief states is that he "would respectfully assert that he was prejudiced by the Kratovil/Amore conflict of interest in that sensitive information related to [his] case may have been shared with a critical state witness, Scott Marshall." This is nothing more than a conclusory statement. That is, Mr. Dunlap has not come forward with evidence, or even mere allegations, showing that Mr. Kratovil provided Mr. Marshall with information about his involvement in the murder of Ms. Dodson. Mr. Dunlap has not asserted that Mr. Marshall gave testimony during the trial that could only have been learned from Mr. Kratovil. In fact, during Mr. Marshall's testimony at trial, he indicated that everything he knew about Mr. Dunlap's confession was told to him by Mr. Dunlap.

■■■■ Further, although we find Mr. Kratovil's continued representation of Mr. Marshall to be troubling, such representation was

14. Mr. Dunlap also contended that Mr. Amore prejudiced his defense because of the conflict of interest. While it is not clear from his brief, presumably Mr. Dunlap asserted a conflict of interest by Mr. Amore because he was in the same law firm with Mr. Kratovil.

harmless because the essence of Mr. Marshall's testimony was the same as that given by three other witnesses. Two of the witnesses, Danielle and Troy Kelican, were friends of Mr. Dunlap who visited him while he was in jail. During the visit, Mr. Dunlap told the Kelicans that he killed Ms. Dodson. The third witness was Mr. Dunlap's daughter, Tabitha Sanders. Ms. Sanders testified that, during her visit with her father while he was hospitalized, he confessed to killing Ms. Dodson. In the final analysis, if we exclude Mr. Marshall's testimony, the jury still had three other witnesses who testified to the same issue that Mr. Marshall testified to. This Court has long held that "[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction." Syl. pt. 20, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974). *See State v. DeWeese*, 213 W.Va. 339, 352, 582 S.E.2d 786, 799 (2003). Based upon the record in this case, there is no reasonable possibility that Mr. Kratovil's potential conflict of interest through his continued representation of Mr. Marshall contributed to Mr. Dunlap's conviction.

## IV.

## CONCLUSION

In view of the foregoing, the trial court's order denying Mr. Dunlap habeas corpus relief from his conviction and sentence is affirmed.

Affirmed.