# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**v.)  No. 23-435** (Monongalia County 22-F-224)

**Robert Peacher,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Robert Peacher appeals the Circuit Court of Monongalia County's June 22, 2023, sentencing order following his convictions for one count each of burglary, second-degree sexual assault, strangulation, domestic battery, and harassment.[1] The petitioner asserts that the evidence was insufficient to support his convictions, that the circuit court erred in considering uncharged conduct when revoking his bond, and that the court erroneously ordered his sentences to run consecutively rather than concurrently. Upon our review, finding no substantial question of law and no prejudicial error, we determine that oral argument is unnecessary and that a memorandum decision affirming the circuit court's order is appropriate. *See* W. Va. R. App. P. 21(c).

The Monongalia County Grand Jury returned a five-count indictment against the petitioner in May 2022, charging him with burglary, first-degree sexual assault, strangulation, domestic battery, and harassment. The petitioner elected to have a bench trial on these charges, which began on March 14, 2023, and lasted two days. Victim B.H., a sex worker, testified that she and the petitioner met through friends and eventually developed a short-lived romantic relationship, which she promptly ended after the petitioner struck her in the face and exhibited other concerning behaviors. B.H. detailed that after the breakup, the petitioner continued to contact her and tell her that she could not end their relationship because they were going to get married and have children; that she belonged to the petitioner; and that he was "claiming" her for life. In one text message to B.H., the petitioner stated, "How you treat me is how I'm going to treat you. You wanted to toss me like I'm some ragdoll . . . [t]hen I will treat you like some ragdoll . . . , and I'll play with you whenever I want."

---

[1] The petitioner appears by counsel Frank C. Walker II, and respondent appears by Attorney General John B. McCuskey and Assistant Attorney General Seth E. Harper. Because a new Attorney General took office while this appeal was pending, his name has been substituted as counsel. We use initials where necessary to protect the identities of those involved in this case. *See* W. Va. R. App. P. 40(e).

B.H. also testified that the petitioner began following her and approaching her when she was in the company of other men. For instance, one evening while B.H. was visiting with her friend and frequent driver, Jebose Chinukwue, the petitioner arrived at her home and slashed Mr. Chinukwue's car tires. Following that incident, B.H. moved into a hotel, but the petitioner found her and knocked on her door, prompting her to find another apartment in which to reside. On another occasion, the petitioner approached B.H. and her friend, Brian Poling, while they were shopping and began to yell at B.H. and Mr. Poling, calling B.H. names and cursing at her. The incident resulted in store employees removing the petitioner from the premises. B.H. stated that the petitioner eventually found her new apartment and loitered outside on several occasions, which was observed by both B.H. and several friends.

B.H. testified that on the evening of March 17, 2021, she was at her home with a client, J.P. According to B.H., as J.P. exited the apartment, the petitioner ran inside the home and slammed the door behind him, locking it. The petitioner moved behind B.H. and put his hand around her throat and mouth and stated it was his "turn," before pushing her to the floor and pulling her underwear down. B.H. stated that she could not breathe and felt that she was going to "black out." The petitioner also smashed B.H.'s head against the floor several times. While B.H. had been using one hand to prevent the petitioner from penetrating her vagina and one hand to try to remove his arm from her neck, she testified that she eventually chose to use both hands to try to remove the petitioner's hand from her nose and mouth so that she could breathe. B.H. stated that the petitioner then wrapped his arm around her neck in a "chokehold," pulled down her underwear, and penetrated her vagina with two fingers before she was eventually able to get away. The petitioner then chased her around the apartment with a knife, but B.H. was able to lock herself in a bathroom and call 9-1-1. B.H. testified that the petitioner stole some money from her dresser before fleeing the premises. After speaking with law enforcement, B.H. proceeded to the emergency room for treatment. B.H. sustained a busted lip and several bruises over her body.

The following morning, the petitioner continued to contact B.H. through a text messaging application, telling B.H. "[a]ll you had to do was come home to Daddy and f*ck me. You're an escort . . . and my wife."[2] Later the same day, the petitioner texted B.H. and stated that he was sorry and that he "should've left." B.H. texted the petitioner, "Are you insane? You can't f'in break into homes and attack women and rape them, Rob. . . . Why would you do that to me?" To which the petitioner responded, "I snapped" and "[s]orry about your lip" and "I didn't want you screaming." B.H. again told the petitioner, "You tried to rape me." At which point, the petitioner stated, "I was just saying, I'm next. Then you started screaming. I was trying to cover your mouth. It just went all wrong, man." Copies of the text messages, as well as photographs of B.H.'s injuries, were submitted into evidence.

Mr. Chinukwue, Mr. Poling, and J.P. all corroborated B.H.'s account of the petitioner's behavior towards her. Mr. Chinukwue confirmed that his tires had been slashed while his car was parked outside of B.H.'s apartment and that the petitioner appeared to be the perpetrator in the surveillance footage. Mr. Chinukwue also testified that he had seen the petitioner looking in the windows of B.H.'s home. Mr. Poling confirmed that the petitioner approached him while he was shopping with B.H. and started yelling at them. On their way back to B.H.'s apartment, Mr. Poling

---

[2] It does not appear that the petitioner and B.H. were ever married.

observed B.H. take a phone call from the petitioner and overheard him threaten B.H. J.P. testified that on the evening of March 17, 2021, he observed a man, whom he identified as the petitioner, loitering around the door of B.H.'s apartment, and that when he later left the apartment, the same man stepped by him to gain access to the apartment. According to J.P., the petitioner's presence was uninvited, and B.H. did not appear happy to see the petitioner.

Dr. Peter Griffin, Assistant Professor of Emergency Medicine at Ruby Memorial Hospital, testified that he treated B.H. during the early morning hours of March 18, 2021. According to Dr. Griffin, B.H. reported that she had been physically and sexually assaulted, choked, and that her vagina had been digitally penetrated. Dr. Griffin stated that B.H. initially agreed to undergo a sexual assault examination, but thereafter declined after she was informed that an examiner would not be available for approximately seven or eight hours. Meredith Linger, the Forensic Nurse Examination Coordinator for Ruby Memorial Hospital, provided expert testimony regarding strangulation. According to Ms. Linger, strangulation occurs when pressure is applied externally to the neck, causing loss of oxygen to the brain. Ms. Linger noted that when the brain cannot get oxygen, the cells of the brain die. She further stated that even if pressure is applied for only a couple of seconds, the brain loses cells which cannot be regenerated. Ms. Linger further testified that not all victims of strangulation have visible external signs or injuries. Ms. Linger also confirmed that the sensation of "blacking out" was a common symptom of strangulation and usually preceded loss of consciousness. Law enforcement officers also testified as to their investigation and their observations of B.H.

The petitioner testified on his own behalf, admitting to banging on B.H.'s window while she was being intimate with other men on multiple occasions because "[s]he's a sex worker and I tried to stop her." The petitioner also admitted to slashing Mr. Chinukwue's tires and to showing up at B.H.'s home on the evening of March 17, 2021, and entering her home "[u]nannounced, uninvited." However, the petitioner denied fighting with B.H., assaulting her, or stealing money from her.

Relevant to this appeal, at the end of the first day of the two-day bench trial, the State moved to revoke the petitioner's bond, stating that it had recently learned that he was a suspect in an investigation regarding soliciting minors at a playground. The State indicated that surveillance footage was available and that it showed the petitioner approaching several young girls on a playground. The footage also showed that one of the girls threw a beverage on the petitioner and that he left the premises and then later returned in a different outfit. The circuit court requested to view the footage, and the petitioner did not object. After viewing the footage, the court revoked the petitioner's bond temporarily pending the rest of the trial. The State moved to admit the surveillance footage into evidence for the purposes of the bench trial, and the petitioner objected on the basis of Rule 404(b) of the West Virginia Rules of Evidence. The court sustained the objection and stated, "I'm not admitting it for this case."

Ultimately, the circuit court found the petitioner guilty of burglary, second-degree sexual assault, strangulation, domestic battery, and harassment, providing an extremely detailed account of how it reached its decision. The circuit court sentenced the petitioner to one to fifteen years of imprisonment for his conviction of burglary, ten to twenty-five years of imprisonment for his conviction of second-degree sexual assault, and one to five years of imprisonment for his

conviction of strangulation, to be served consecutively to each other. The court also sentenced the petitioner to one year for domestic battery and six months for harassment, which were to be served concurrently to each other and concurrently to the other sentences. The court further revoked the petitioner's bond based upon his convictions. This appeal followed.

In the petitioner's first assignment of error, he argues that the circuit court erred in considering the surveillance footage and the investigation into allegations that he solicited minors to revoke his bond on the first day of trial. The petitioner contends that the footage and discussion of the investigation was "bad acts evidence" and was erroneously admitted in violation of Rule 404(b) of the West Virginia Rules of Evidence. However, the petitioner failed to object to the circuit court's consideration of this evidence to temporarily revoke his bond, and, therefore, any argument in this regard is waived. *See Coleman v. Sopher*, 201 W. Va. 588, 614, 499 S.E.2d 592, 618 (1997) (McHugh, J., concurring) (stating that Rule 404(b) objections must be made in order to preserve the issue for appellate review); *see also* W. Va. R. App. P. 10(c)(7) ("The argument must contain appropriate and specific citations to the record on appeal, including citations that pinpoint when and how the issues in the assignments of error were presented to the lower tribunal."). We further note that the petitioner does not address the fact that the circuit court formally revoked the petitioner's bond based upon his convictions, rather than the surveillance footage and related evidence, at the end of the bench trial one day later.

The petitioner also assigns as error the circuit court's decision to order the petitioner to serve his sentences for burglary, second-degree sexual assault, and strangulation consecutively, rather than concurrently. The petitioner contends that the circuit court's consideration of evidence of the surveillance footage and investigation into his solicitation of minors, which he claims constitutes Rule 404(b) evidence, amounted to consideration of an impermissible factor at sentencing. While the petitioner admits that "the trial [c]ourt never explicitly stated it was relying on the impermissible Rule 404(b)" evidence, he contends that the court, as the factfinder in this case, was "materially tainted" by hearing this evidence. The petitioner contends that, given that the court considered an impermissible factor, its decision to run the sentences consecutively was in error and that his sentences should be vacated.

Our analysis of this issue is guided by Syllabus Point 4 of *State v. Goodnight*, 169 W. Va. 366, 287 S.E.2d 504 (1982), which provides that "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Impermissible factors include "race, sex, national origin, creed, religion, and socioeconomic status." *State v. Moles*, No. 18-0903, 2019 WL 5092415, at *2 (W. Va. Oct. 11, 2019) (memorandum decision) (citation omitted). Here, the petitioner does not contend that his sentences were outside the statutory limits and, instead, claims that the court's consideration of Rule 404(b) evidence amounted to consideration of an impermissible factor. However, the petitioner fails to cite to any authority qualifying Rule 404(b) evidence as an impermissible factor. Indeed, this Court has previously noted that "[t]he rules of evidence, including Evid. R. 404(b) regarding 'other acts,' do not strictly apply at sentencing hearings." *State ex rel. Dunlap v. McBride*, 225 W. Va. 192, 202, 691 S.E.2d 183, 193 (2010) (quoting *State v. Combs*, No. CA2000-03-047, 2005 WL 941133, at *2 (Ohio Ct. App. 2005)). Accordingly, we find no merit in the petitioner's argument that the court considered an impermissible factor; in fact, as admitted by the petitioner, the court did not even reference the contested evidence when sentencing the petitioner.

4

To the extent that the petitioner argues that the court should have ordered his sentences to run concurrently, rather than consecutively, we note that, by statute, sentences for two or more offenses run consecutively, unless a circuit court in its discretion provides that the sentences run concurrently. *See* W. Va. Code § 61-11-21. Accordingly, we find that the petitioner is entitled no relief in this regard.

Lastly, the petitioner argues that the State failed to present sufficient evidence to sustain his convictions for burglary, second-degree sexual assault, strangulation, and domestic battery. Challenging the sufficiency of the evidence to support a conviction is a heavy burden. Syl. Pt. 9, in part, *State v. Stone*, 229 W. Va. 271, 728 S.E.2d 155 (2012) (quoting Syl. Pt. 3, in part, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995)). This Court reviews "all the evidence . . . in the light most favorable to the prosecution" and credits "all inferences and credibility assessments that the jury might have drawn in favor of the prosecution." *Stone*, 229 W. Va. at 274, 728 S.E.2d at 158, Syl. Pt. 9, in part. We will only set aside a verdict "when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* In sum, "the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, in part, *State v. Juntilla*, 227 W. Va. 492, 711 S.E.2d 562 (2011) (quoting *Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 1, in part).

Upon our review, we conclude that the petitioner has not met his high burden of establishing that the evidence was insufficient to support his convictions. While the petitioner contends that the State failed to prove certain elements of burglary, including that he broke and entered B.H.'s home, West Virginia Code § 61-3-11(a) (2018) provides that "[a]ny person who breaks and enters, *or enters without breaking*, a dwelling house or outbuilding adjoining a dwelling with the intent to commit a violation of the criminal laws of this state is guilty" of burglary. (Emphasis added). Accordingly, the State was not required to prove that the petitioner broke and entered B.H.'s home so long as it proved that he entered without breaking. And here, the evidence, by way of the petitioner's own testimony that he entered the victim's home, was sufficient to prove that element. The petitioner also contends that the State failed to prove that he entered the home with the intent to commit a crime. However, B.H.'s testimony that the petitioner immediately covered her nose and mouth and forced her to the floor upon entering the home, coupled with the recent text messages from the petitioner stating that he was "claiming" her for life and planned to treat her like a ragdoll and "play with her whenever [he] want[ed]," were sufficient evidence from which the court could find that the petitioner had the requisite intent to commit a crime. As such, we find no merit to the petitioner's claims that the State failed to present sufficient evidence to support a conviction of burglary.

Regarding second-degree sexual assault, the petitioner claims that the State failed to prove that the petitioner engaged in sexual intercourse or intrusion with B.H., and he also contends that B.H.'s testimony did not establish that the petitioner was the perpetrator of the crime. West Virginia Code § 61-8B-4(a)(1) provides that "[a] person is guilty of sexual assault in the second degree when . . . [s]uch person engages in sexual intercourse or sexual intrusion with another person without the person's consent, and the lack of consent results from forcible compulsion[.]" Here, the petitioner is essentially attacking B.H.'s credibility by stating that her testimony identifying the petitioner as the person who entered her home, forced her to the ground, and

digitally penetrated her vagina was insufficient to support a conviction of second-degree sexual assault. We have previously held, however, that "[a] conviction for any sexual offense may be obtained on the uncorroborated testimony of the victim, unless such testimony is inherently incredible, [and] the credibility is a question for the jury." Syl. Pt. 5, *State v. Beck*, 167 W. Va. 830, 286 S.E.2d 234 (1981); *see Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part (holding that "[c]redibility determinations are for a jury and not an appellate court"). Here, the trial court, as the factfinder, specifically found that B.H. was a credible witness and that the petitioner's text messages to B.H. the day after the incident supported her testimony that the petitioner forcibly, and without her consent, penetrated her vagina with his fingers. The court noted that one of B.H.'s most reliable statements of what occurred was when she described having to make a choice between "dying or being raped," and that she chose to remove the hand that was attempting to prevent the petitioner from penetrating her vagina so that she could use both hands to remove the petitioner's hand and arm from restricting her airways. Further, text messages from B.H. to the petitioner informed him that he could not "break into homes and attack women and rape them," and, upon reply, the petitioner did not deny B.H.'s accusations but, rather, stated that he "snapped" and apologized. Given the forgoing, we conclude that the circuit court was presented with sufficient evidence to find B.H.'s testimony regarding the sexual assault to be credible, and that this evidence supported his conviction of second-degree sexual assault. We decline to disturb this determination on appeal. *See State v. Trail*, 236 W. Va. 167, 188, 236 S.E.2d 616, 637 (2015) ("This Court will not disturb weight and credibility determinations made by the jury.").

Regarding strangulation, the petitioner argues that the State failed to prove that the petitioner strangled, suffocated, or caused physical harm to B.H., as her testimony indicated that she did not see the individual who strangled her, and there were no marks or injuries to B.H.'s neck to support a finding of strangulation. Pursuant to West Virginia Code § 61-2-9d(b), "[a]ny person who strangles, suffocates or asphyxiates another without that person's consent and thereby causes the other person bodily injury or loss of consciousness is guilty of a felony[.]" The term "'strangle' means knowingly and willfully restricting another person's air intake or blood flow by the application of pressure on the neck or throat[.]" *Id.* at § 61-2-9d(a). Further, the term "'bodily injury' means substantial physical pain, illness or any impairment of physical condition[.]" *Id.* Here, the evidence demonstrated that the petitioner placed his hand around B.H.'s nose and mouth and then later placed her in a "chokehold" by putting his arm around her neck. B.H. testified that she could not breathe, repeatedly tried to remove the petitioner's hands and arm from blocking her airways, and thought she was going to "black out." Ms. Linger's expert testimony established that the sensation of blacking out is a common symptom of strangulation, which frequently precedes lack of consciousness, and that victims of strangulation often have no visible injuries or marks. Ms. Linger further testified that the lack of oxygen to the brain results in brain cells dying, which is permanent and irreversible. To the extent that the petitioner claims that he was not identified as the perpetrator, text messages from the petitioner to B.H. the day after the incident establish that the petitioner admitted as much, stating "Then you started screaming. I was trying to cover your mouth. It just went all wrong[.]" Accordingly, based on the forgoing, we conclude that the State presented sufficient evidence for the court to find the petitioner guilty of strangulation.

The petitioner makes the same argument for domestic battery as he did for strangulation, contending that there was insufficient proof of physical harm to B.H. given the lack of marks on her neck. West Virginia Code § 61-2-28(a) defines domestic battery as "[a]ny person who

6

unlawfully and intentionally makes physical contact of an insulting or provoking nature with his or her family or household member, or unlawfully and intentionally causes physical harm to his or her family or household member[.]" Here, the petitioner does not contest that B.H. is a "family or household member" under the relevant statutory definition. Further, the evidence established that B.H. sustained bruises and a busted lip as a result of the petitioner's actions. To the extent the petitioner claims he was not identified as the perpetrator, evidence was presented that the petitioner sent a text message to B.H. the day after the incident stating, "Sorry about your lip." Accordingly, we find that the State presented sufficient evidence of the element of physical harm, and the court did not err in finding the petitioner guilty of domestic battery.

In sum, it cannot be said that the record contains no evidence from which the petitioner's guilt beyond a reasonable doubt could be found, so this assignment of error lacks merit. *See Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part ("[A] jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.").

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** May 28, 2025

**CONCURRED IN BY:**

Chief Justice William R. Wooton
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice C. Haley Bunn
Justice Charles S. Trump IV

7