# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Rimdaugas K.,**
**Petitioner Below, Petitioner**

**v.)  No. 23-384** (ICA No. 22-ICA-174)

**Gerda K.,**
**Respondent Below, Respondent**


## MEMORANDUM DECISION


Petitioner Rimdaugas K. appeals the May 23, 2023, memorandum decision of the Intermediate Court of Appeals of West Virginia ("ICA"), which affirmed the Family Court of Gilmer County's September 16, 2022, "Final Order Modifying Parenting Plan and Child Support."[1] *See Rimdaugas K. v. Gerda K.*, No. 22-ICA-174, 2023 WL 3581504 (W. Va. Ct. App. May 23, 2023) (memorandum decision). The petitioner argues that the family court erred in modifying the parties' parenting plan as to one child but not the other two, in failing to find that one of the parties' children was abused by the respondent and then failing to impute that abuse to the other two minor children, and in relying on hearsay and a prior temporary custody order in modifying the parenting plan. Upon our review, finding no substantial question of law and no prejudicial error, we determine oral argument is unnecessary and that a memorandum decision affirming the ICA memorandum decision is appropriate. *See* W. Va. R. App. P. 21(c).

The parties, who were divorced in South Carolina in 2018, are parents to three children: M.K., born in 2005; A.K., born in 2008; and E.K., born in 2011. In that South Carolina action, a temporary custody order was entered in 2016, prior to the final resolution, after the petitioner took the three children out of the country ("2016 order"). The 2016 order awarded the respondent immediate custody of the three minor children, noting that the children were removed from the country against her wishes and that constituted interference with her custodial rights. In the subsequent 2018 parenting plan, the respondent was established as the primary residential parent, and the petitioner was provided two weekends of visitation per month. After the divorce, the respondent moved to West Virginia with the children, and the petitioner moved to Georgia. In November 2021, the petitioner filed a petition to transfer jurisdiction over the matter and a petition

---

[1] Petitioner Rimdaugas K. is represented by counsel Amy L. Lanham. Respondent Gerda K. is represented by counsel Michael A. Hicks. We use initials where necessary to protect the identities of those involved in this case. W. Va. R. App. P. 40(e).

for modification in West Virginia.[2] In his petition, the petitioner alleged that a substantial change in circumstances warranted a modification of the parenting plan based on, among other things, M.K.'s stated preference to reside with the petitioner, M.K.'s poor grades, and a troubled and at times allegedly abusive relationship between the respondent and M.K. The petitioner also expressed concerns about the two younger children remaining with the respondent and discussed a lack of extracurricular activities and similar grade issues. The respondent filed a response, in which she, among other things, denied an abusive relationship and asserted that M.K.'s decline in grades was a result of pandemic-related disruptions and his above-age grade placement.

On December 31, 2021, after the petition for modification of custody was filed but before it was heard, M.K. and the respondent were involved in an incident involving a model airplane that resulted in a state trooper coming to the respondent's home and a referral to West Virginia Department of Human Services,[3] Child Protective Services ("CPS") (the "model airplane incident"). At a preliminary hearing on the petition in January 2022, the parties presented an agreement to transfer at least temporary custody of M.K. to the petitioner, without any admissions by the respondent. The family court approved the transfer of the case to West Virginia and memorialized the parties' agreement regarding the custody of M.K. in a pendente lite order dated January 12, 2022. In that pendente lite order, the family court also denied a request to appoint a guardian ad litem, based on expense, but directed CPS to conduct interviews of the minor children and provide a written report "on its findings of the domestic violence between the Respondent and [M.K.]" pursuant to West Virginia Code § 48-9-301.

The family court conducted hearings on the petition for modification on March 7, 2022, and June 27, 2022. The CPS representative who was on call on the date of the model airplane incident when the state trooper contacted CPS and was later assigned to investigate the allegations of abuse testified. She testified that the trooper told her the respondent was not interested in pressing charges, that he felt there was no danger, and that he was going to call in a referral. She was then assigned to investigate the allegations of abuse. She interviewed all members of the family except for the respondent. M.K. reported to the CPS representative that, in December 2020, he told the respondent that he was not going to believe her "slander" against the petitioner anymore and that this is when the significant conflict in their relationship began. She reported that M.K. told her that the respondent would try to provoke him and told his sisters, A.K. and E.K., not to

---

[2] Although the ICA memorandum decision indicates the petition was filed after the model airplane incident, the date of that incident is immaterial to the discussion of the assignments of error in that decision and so any error is harmless.

[3] Pursuant to West Virginia Code § 5F-2-1a, the agency formerly known as the West Virginia Department of Health and Human Resources was terminated. It is now three separate agencies—the Department of Health Facilities, the Department of Health, and the Department of Human Services. *See* W. Va. Code § 5F-1-2. For purposes of appeals involving the Bureau for Social Services, including CPS, the agency is now the Department of Human Services ("DHS"). *See id*. § 5F-2-1a(b)(1); *id*. § 49-2-101.

talk to him for essentially all of 2021. The CPS representative also testified that M.K. reported an incident in May 2021 where he and the respondent were physical with each other; however, she could not corroborate that incident. Regarding the model airplane incident, based on her interviews, the CPS representative testified that M.K. was building and painting a model airplane when the respondent told him to put it away. A scuffle ensued, and while there are conflicting reports about exactly what occurred, both M.K. and the respondent had scratches on their arms, as reflected in pictures. The respondent ultimately reported the incident to the West Virginia State Police, and a trooper came to the residence and spoke to the respondent and her boyfriend but apparently did not question the children or look at M.K.'s arm. M.K. reported to the CPS representative that the trooper told him that he was lucky the respondent was not pressing charges. The CPS representative found M.K. to be credible, and she substantiated maltreatment by the respondent. But because M.K. was removed from the home by agreement of the parties, CPS found there was no further danger, and no services or safety plans were implemented. She further believed that there was some psychological abuse of A.K. and E.K. based on the allegations that they were directed by the respondent not to speak to M.K. and that the respondent told them she saved them from the petitioner; however, the CPS representative agreed that the other allegations were unsubstantiated. She testified that she believed it would be in the children's best interests to change primary custody from the respondent to the petitioner. Significantly, upon questioning by the family court, the CPS representative agreed that there was not enough evidence to present the case as an abuse and neglect matter and that she was speculating that there could have been a case if A.K. and E.K. disclosed further information. In addition to the CPS representative's testimony, the CPS report was entered into evidence. It indicated the children were not in danger but was internally inconsistent regarding whether maltreatment had occurred. The CPS representative explained that the report's finding of no maltreatment was based on the removal of M.K. from the home by agreement of the parties. The family court also spoke to M.K., E.K., and A.K. in camera. The CPS report and testimony indicated that both A.K. and E.K. wanted to live with the respondent and that their grades had improved.

The petitioner testified regarding M.K.'s dramatic improvement in grades since his move to Georgia. He expressed concern with E.K.'s grades and what he perceived as a pattern of excessive punishments by the respondent. As an example, the petitioner testified that the respondent took away A.K.'s cell phone for weeks because she failed to clean her room. Based on the alleged mistreatment of M.K. and what he believed was a similar pattern occurring with the younger children, the petitioner contended that it was in the best interests of the children that they all live with him. Regarding the 2016 order in South Carolina, the petitioner disputed the contention that he took the children out of the country without permission and produced e-mails he stated demonstrated a discussion about the trip and a return date. He testified that the final order of custody in South Carolina was better for him because he refuted the allegations that he took the children on that trip without the respondent's permission. He also claimed he did not speak English well at the time of the 2016 order and did not initially have an interpreter.

The respondent also testified. She indicated that M.K.'s grades began to suffer before the move to West Virginia but agreed that his grades needed to improve. She testified that A.K. and E.K. generally had good grades, with E.K. struggling with one subject, but that it was not unusual

to struggle in a particular subject. She further contended that the punishment of A.K. for failing to clean her room was appropriate and denied abusing any of the children. Addressing the model airplane incident, she testified that when she began picking up the pieces of the airplane, M.K. became agitated. She was scratched by the airplane parts after M.K. became physical. The respondent called her boyfriend and then the state police for help managing M.K.'s behavior, and she initiated contact with CPS through the state trooper. Further questions about her conversation with the trooper regarding potential charges for the incident drew hearsay objections from the petitioner that were sustained. The respondent testified that she was not charged in the model airplane incident. She confirmed her agreement that M.K. could live in Georgia with the petitioner.

Regarding the 2016 order, the respondent testified that when the petitioner left with the children to return to their native country, she believed he was taking them to a beach about three hours from where they used to live. She testified she could not contact the children for two days and then received an e-mail from the petitioner that stated they were in their native country, and they did not have an interest in coming back. She sought intervention by the family court in South Carolina. Although the e-mails produced by the petitioner showed a conversation with the respondent about returning to their native country, she stated that was related to what the petitioner would do as a result of their separation. She stated the South Carolina court found the children were removed from the country against her wishes. She disputed the petitioner's contention that he could not speak and understand English well at that time.

The family court entered its "Final Order Modifying Parenting Plan and Child Support" on September 16, 2022. Relevant to this appeal, the family court noted it gave weight to the respondent's exhibits, a picture of the respondent's arm after the model airplane incident, and the 2016 order from South Carolina. The family court found the petitioner to be deceptive about the children's trip out of the country. Regarding the model airplane incident, the family court found that the state trooper who came to the petitioner's home indicated he was contemplating a juvenile petition against M.K. The family court found that M.K. was "violently unhappy" with the respondent, he did not want her in his life, he identified with the petitioner, and his grades and behavior had improved since moving in with the petitioner. The family court concluded that there was a substantial change in circumstances for M.K., and he had a firm and reasonable preference to live with the petitioner. The family court expressed concern that the respondent was not interviewed by CPS and found that, based on all the testimony presented, the respondent did not abuse M.K. It further found that the petitioner encouraged M.K. to behave badly and that he pressured all the children to testify on his behalf. The family court concluded that the petitioner should be named as the primary residential parent of M.K. and time allocation could continue as agreed. The family court found that A.K. and E.K. clearly and unambiguously desired to remain with the respondent. It found no change of circumstances for A.K. and E.K.

The petitioner appealed the family court's order to the ICA, asserting three assignments of error: that based on the evidence presented, the family court abused its discretion by denying his motion to modify the parenting plan for A.K. and E.K.; the family court committed error in finding that M.K. was not abused, and then failing to impute that abuse to A.K. and E.K.; and that it was an abuse of discretion to consider hearsay evidence and the 2016 order. The ICA affirmed the

4

family court order in a memorandum decision, concluding that the family court order was not clearly wrong, the family court did not abuse its discretion, and any error made by the family court in its order was harmless. *See Rimdaugas K.*, 2023 WL 3581504, at *4.

The petitioner now appeals to this Court from the ICA's memorandum decision, and our review is guided by the following standard:

> On appeal of a final order of a family court from the Intermediate Court of Appeals of West Virginia, the Supreme Court of Appeals of West Virginia shall review the findings of fact made by the family court for clear error, and the family court's application of law to the facts for an abuse of discretion. The Supreme Court of Appeals shall review questions of law de novo.

Syl. Pt. 3, *Christopher P. v. Amanda C.*, 250 W. Va. 53, 902 S.E.2d 185 (2024). When addressing child custody issues, we have further held that "[q]uestions relating to . . . custody of the children are within the sound discretion of the court and its action with respect to such matters will not be disturbed on appeal unless it clearly appears that such discretion has been abused." Syl., in part, *Nichols v. Nichols*, 160 W. Va. 514, 236 S.E.2d 36 (1977).

Before this Court, the petitioner makes the same assignments of error presented to the ICA. In the petitioner's first assignment of error, the petitioner argues that the family court abused its discretion in denying modification of the parenting plan as to A.K. and E.K., when the plan was modified for M.K. West Virginia Code § 48-9-401(a) requires a court to modify a parenting plan when it finds

> on the basis of facts that were not known or have arisen since the entry of the prior order and were not anticipated in the prior order, that a substantial change has occurred in the circumstances of the child or of one or both parents and a modification is necessary to serve the best interests of the child.

Here, the record on appeal supports the family court's finding that there was no substantial change in A.K. and E.K's circumstances warranting modification. With the exception of E.K.'s math grade, A.K. and E.K. were performing well in school, they disclosed no abuse or other issues with the respondent, and they expressed a clear and unambiguous preference to stay with the respondent as the primary residential parent. No facts demonstrated a change in circumstances that required modification for A.K. and E.K. This is in contrast to the situation with M.K., who stated a firm and reasonable preference to live with the petitioner and whose relationship with the respondent had become contentious.[4] His behavior and grades improved after the agreed-upon change in

---

[4] Even without a change in circumstances, West Virginia Code § 48-9-402(b)(3) provides for modification of a parenting plan as "necessary to accommodate the reasonable and firm preferences of a child who[] has attained the age of 14[.]"

custody. Therefore, the family court did not abuse its discretion in modifying the parenting plan as to M.K., but denying modification as to A.K. and E.K.

Next, the petitioner alleges error in the family court's finding that the respondent did not abuse M.K. based on the allegedly unrebutted testimony presented, and he argues that, if one child is abused, that abuse is imputed to all children in the home under *In re Christina L.*, 194 W. Va. 446, 460 S.E.2d 692 (1995). Here, the family court interviewed all three children, in addition to hearing testimony from the parties and the CPS representative. It considered and weighed the evidence, and it made credibility determinations—functions exclusively reserved to the trier of fact. *State v. Guthrie*, 194 W. Va. 657, 669 n.9, 461 S.E.2d 163, 175 n.9 (1995). Although the CPS representative indicated that she found M.K. credible and that there were allegations of abuse and maltreatment, the CPS case was closed when M.K. relocated, and those allegations were ultimately unsubstantiated through CPS's interviews with A.K. and E.K. Significantly, the family court also noted its concerns with the failure of CPS to interview the respondent. The testimony related to the claimed abuse was not unrebutted; rather, M.K. and the respondent gave differing accounts, and the family court properly resolved that conflict in the evidence. Therefore, the petitioner has not demonstrated clear error in the family court's finding that no abuse by the respondent occurred. Further, because we conclude there was no clear error in the family court's finding that M.K. was not abused, we do not reach the issue of whether any claimed abuse of M.K. should be imputed to A.K. and E.K. in this case.[5]

In his third assignment of error, the petitioner argues that the family court abused its discretion in evidentiary matters. First, he claims the family court erred by considering the state trooper's comments—as conveyed by the respondent—regarding the filing of a juvenile petition against M.K. following the model airplane incident after ruling those comments were hearsay. Next, the petitioner claims error in the family court's consideration of the 2016 order.[6]

---

[5] The ICA also noted that there was no finding that A.K. and E.K. were at risk of abuse.

[6] During his discussion of his third assignment of error, the petitioner appears to take issue with the fact that the family court ordered an investigation by CPS instead of appointing a guardian ad litem in this case due to the expense. However, there is no legal argument related to this decision; consequently, we will not address any claimed error. Rule 10(c)(7) of the West Virginia Rules of Appellate Procedure requires, in pertinent part, that a "[petitioner's] brief must contain an argument clearly exhibiting the points of fact and law presented, the standard of review applicable, and citing the authorities relied on, under headings that correspond with the assignments of error." *See also State v. LaRock*, 196 W. Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are not raised, and those mentioned only in passing but are not supported with pertinent authority, are not considered on appeal."); *State v. Lilly*, 194 W. Va. 595, 605 n.16, 461 S.E.2d 101, 111 n.16 (1995) (finding that cursory treatment of an issue is insufficient to raise it on appeal).

Regarding the trooper's comments conveyed by the respondent, we find that any reliance on that hearsay by the family court was harmless error. Even without the state trooper's statement, there was sufficient evidence to support the family court's decision, including, but not limited to, the stated preference of the children, the interviews with the children, the fact that many of the allegations made were ultimately unsubstantiated, and the children's grades. Accordingly, we conclude that any reference or finding in the family court order related to the state trooper's statement was harmless error.

Regarding the 2016 order, we note that it was not presented by the respondent to argue, or cited by the family court to support, the specific custodial allocation set forth in that order, which would be impermissible under West Virginia Code § 48-9-206(c).[7] Instead, the temporary order was introduced to impeach the petitioner's claim that he had never left the country with the parties' children without permission. The family court's order demonstrates the 2016 order was considered only for impeachment, referencing the order in its findings that the petitioner was deceptive in dealing with the respondent regarding the trip out of the country. While the petitioner does not agree with the family court's findings and conclusions related to the 2016 order, he did have the opportunity to present testimony and exhibits to contradict those findings, and as discussed above, credibility decisions and decisions about the appropriate weight of evidence presented are left to the trier of fact.[8] Based on our review of the family court order and the record on appeal, we conclude that the petitioner has not demonstrated an abuse of discretion or error related to the family court's consideration of the 2016 order for purposes other than the custodial allocation based on the record on appeal.

As noted above the ICA affirmed the family court order, concluding that the family court order was not clearly wrong, the family court did not abuse its discretion and any error made by the family court in its order was harmless. Having reviewed the family court order and the record on appeal, for the reasons discussed herein, we affirm the ICA's May 23, 2023, memorandum decision.

Affirmed.

**ISSUED:** November 26, 2024

---

[7] West Virginia Code § 48-9-206(c) provides, in relevant part, that the court "may not consider the temporary allocation of custodial responsibility imposed by a court order on the parties unless both parties agreed to the allocation provided for in the temporary order."

[8] We note that the ICA also discussed the relevance of the 2016 order to the petitioner's interference with the respondent's parental rights, a consideration under West Virginia Code § 48-9-209(a)(4). *See Rimdaugas K.*, 2023 WL 3581504, at *4

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Elizabeth D. Walker
Justice John A. Hutchison
Justice William R. Wooton
Justice C. Haley Bunn